WILLIAM BARCLAY SMITH, Respondent, *v.* THE NEW YORK CENTRAL RAILROAD COMPANY, Appellants.

CONTRACT FOR SALE AND DELIVERY; PROOF CONCERNING. PAROL. STATUTE OF FRAUDS. ACCEPTANCE. CHARGE TO JURY. ERROR.

Where an agreement lies wholly in parol, some of the terms of which are contained in a written contract, used by way of reference only, and not as containing any operative words of obligation, but as rendering the verbal agreement definite in details, proof of the execution of such instrument is not necessary, — it is sufficient to identify the paper.

A contract for the sale and delivery of a quantity of wood, though the same be at the time in standing trees, is not a contract for work and labor, so as to take the transaction out of the statute of frauds.

Where, in an action for the sale and delivery of merchandise, the essential question relates to the acceptance by the defendant of the property in question, and the testimony of the plaintiff, if undisputed, would not establish the fact of acceptance by the defendant, as a legal conclusion, it is error for the court to charge, that, if the jury credit the testimony of the plaintiff and his witnesses, their verdict must be in his favor. The jury should be directed to find, specifically, whether, from all the testimony in the case, there was an acceptance on part of the defendant.

APPEAL from a judgment for the plaintiff on verdict affirmed in the Supreme Court in General Term for the seventh district.

The action was brought to recover for wood alleged to have been sold and delivered to the defendants. One portion thereof alleged to have been bargained for on or about the 1st of August, 1857, and delivered by the plaintiff at Farmington station, in the county of Ontario, between the said 1st of August and the 1st of June, 1858. Another portion thereof alleged to have been sold and delivered by the plaintiff and one Brown, at Paddleford's station, in the said county, on or about the 1st day of January, 1858; each at the agreed price of $3 per cord for wood of the first quality (or hard wood), and $2.25 per cord for the second quality (or soft wood). The answer denied the allegations of the complaint, and alleged, that for all wood ever purchased by the defendants from the plaintiff, or from the plaintiff and Brown, the defendants have fully paid.

The case was tried before the Hon. HENRY WELLES, late justice of the Supreme Court.

On the trial, the testimony on the part of the plaintiff in respect to wood delivered at Farmington, was, that in October, 1857, one Andrew A. Young, acting on behalf of the defendants and in their employment, was at Farmington, and in pursuance of an appointment made by him with the plaintiff, by a letter stating the price of wood to be the same as the previous year, "$3 for first and $2.25 for second quality, and no basswood on any account," went with him and looked at the wood standing upon a wood lot in the vicinity of the station, with a view to a purchase of the wood, and after some conversation in which the plaintiff told him that he "would not chop off his wood unless he could sell his basswood." Young said, "there is but very little basswood, and I will take your wood; let's go to the house and draw up a contract." The plaintiff, stating that he was about to go to the West where he had received an offer of a situation, replied, that "he didn't want to confine himself to a written contract to deliver this wood, in case he accepted the offer west; if he didn't accept the offer he should return within two weeks after he should leave;" that Young told him that, if he did not stay at the West and should return, he "might draw it on the old contract; for he didn't wish to be coming out here to draw up contracts every few days."

That the plaintiff, having concluded not to accept the offered situation, set men to chopping about the 10th of November, and about the 1st of February, 1858, commenced drawing wood to the Farmington station, and while delivering, saw Young and asked Young's consent to deliver wood on his own (plaintiff's) land, which was in the vicinity of the station; that Young consented, and asked him to permit others to deliver wood on his ground, and to that the plaintiff consented. The plaintiff deposited the wood on his own land, and, according to one statement by the plaintiff, about the 25th of February he saw Young there, and Young promised to measure his wood the next month; that, according to another statement by the plaintiff, about the 22d of February he was urging Young to have his wood measured because of an execution against him, and Young then stated

that he could not measure it because the plaintiff had no written contract, but that he (Young) was going to Albany and would induce the general wood agent to allow him to measure the wood for the plaintiff. Plaintiff continued to draw wood, and in the latter part of March he again saw Young at Farmington, and he again declined measuring plaintiff's wood, and asked him to wait. Plaintiff consented and continued to deliver. After another month he again saw Young at Farmington, and urged that he wanted money to pay his choppers and drawers. Young stated that he could not measure his wood this month; but, to assist him, advised that the plaintiff have his wood measured under a contract in writing, which one Allen P. Devoll had with the defendants for the delivery of wood.

Before this, however, the execution against the plaintiff had been levied upon the wood, and the plaintiff, acting on Young's suggestion, arranged with Devoll to permit all the wood of the first quality which had been drawn, viz., 125 cords, to be measured as part of the wood he (Devoll) was to deliver on his contract. This was done, and the sheriff received the money therefor; but it was paid for as a payment on Devoll's contract, and he gave a receipt therefor; and the wood so measured was used by the defendants.

At the time of the last named conversation with Young, in April, the plaintiff told Young that he had about 200 cords more to draw. Young said he was sorry plaintiff had so much and wished he would not draw it on; that they were overflowed with wood. The plaintiff told him he had it chopped, and was going to draw it on. In May or June, he again asked Young to measure it, and Young told him he could not measure it because the plaintiff had no written contract. This was after all of the wood had been delivered, *i. e.*, had been deposited upon the plaintiff's land near the station.

It further appeared, that Young, at about the same time, made other verbal contracts for the purchase of wood for the defendants, which wood, or some of it, was received and paid for by the defendants.

The plaintiff, having, by himself and another, identified a contract dated the 1st of December, 1856, as the "old contract," referred to in the plaintiff's conversation with Young, offered it in evidence. The defendants objected that it could not be read until the execution thereof was proved by the subscribing witness, which objection was overruled, and the defendants excepted.

That agreement purported to be made by the plaintiff and John T. Brown with the defendants, and to bind the plaintiff and Brown to deliver at Paddleford station, on or about the 1st of August, 1857, 400 to 600 cords first quality wood, and 50 to 75 cords second quality wood, split, piled in a manner specified, and with such space between the piles as shall be approved by the wood agent or his assistants, and in all respects subject to the direction of the general wood agent of the company and his assistants at all times. The price agreed to be paid was $3 per cord of first quality, and $2.25 per cord of second quality, "according to the measurement of the agent of the company," and the agreement then continued: "Payments will be made on or about the twentieth day of each month for all wood delivered and piled as required by this contract before the close of the previous month, and which shall have been approved and accepted by the general wood agent. And it is further agreed, that the measurement made by the agent of said company, appointed for the measurement of wood, shall be final."

This agreement purports to be signed,

"D. HAMILTON, General Wood Agent.

"Witness, M. H. ST. JOHN."

It appeared also, that when the sheriff levied upon the wood he also levied, or proposed to levy, on all the wood which had been cut; although he did not go into the woods he could see the wood as it was "near by;" he did not touch the wood except to walk over it, and did not measure nor move any of it. He had two executions against the plaintiff, and after receiving the amount allowed to Devoll for the 125 cords, which was delivered by the latter under his contract, the sheriff, on the 3d of October, 1858, sold at sheriff's sale all

the rest of the wood then at Farmington station, and it was purchased by Joseph T. Smith, a brother of the plaintiff. On the 10th of November, 1858, an execution was received by the sheriff, against the plaintiff and the said Joseph T. Smith and others, which the sheriff levied upon the same wood at Farmington station, and sold it at sheriff's sale to Gain R. Smith, who bid it off for Jared Smith, his father. The testimony of Jared Smith and Joseph T. Smith both tended to show, that in purchasing at these sheriff's sales they acted for the benefit of the plaintiff, or to assist him. Joseph T. testified, that after his purchase he gave authority to the plaintiff "to go on and dispose of it for *me*, the same as if there had been no sale on execution;" and that since the second sale the wood remained at the station, "and it was understood with the plaintiff in the execution, that he (Joseph) was to dispose of it as he pleased." And Jared testified, in substance, that he bought it at the second sale for the benefit of the plaintiff, and that he afterward proposed to sell it to one of the railroad men, who reported himself to him as wood agent.

In regard to the wood, alleged in the complaint to have been sold to the defendants and delivered at Paddleford station, the plaintiff testified, that he and Brown delivered at Paddleford under the written contract, in the winter of 1856, 1857 and 1858, and that there is in the neighborhood of 150 cords that have not been measured or paid for; that he does not recollect having any conversation with Young about that. Wheeler, who removed the wood remaining at Paddleford in April, 1859, states the quantity at 104 18-100 cords. One Brady, who was in the employment of the company, being examined by the plaintiff, testified that he had orders from one Shaw (who appeared by the evidence to have also bought wood for the defendants), to have all the wood that was drawn at that place put close to the track so as to be got at; but he also testified, that he had no authority from Shaw or any one to accept wood, and that he did nothing except direct the man who drew the wood where to pile it.

Brown, the party with plaintiff in this written contract,

examined by the plaintiff, testified that, prior to August, 1857, "we had not drawn enough to fill our contract, and in the fall of 1857, we *drew* the *remainder*—it was received and *paid for.*"

That he had a conversation with Young: "He stated to me that he didn't want to bother with making small contracts for wood; he wanted all the wood he could get which would pass examination." On cross-examination: "Plaintiff and I had but one written contract with defendants." * * "We had verbal contracts with Young to take and pay for all we would deliver; Young said so to me; this conversation was in the forepart of 1857; he wanted we should draw all we could; we did not bind ourselves to draw any more than this written contract called for."

On re-direct examination: "In 1856 Young and I had a conversation separate from Smith; he wanted me to make a contract for 5,000 cords, and I told him I would if Barclay would, but he declined. I told Young that we couldn't bind ourselves to bring any more wood than we were confident we could get out; then, he said, we'll make a contract for 300 or 400 cords. We told him we had more than that to get out; he said, bring it on, he would take and pay for all we would get out. I told him we could not bind ourselves to bring on any more than we could get out, although we thought we could get out more than the contract calls for. We told him we had more wood; he said, we want it, bring it on. He agreed to pay for all we should deliver, more or less. The lot was one we purchased for the wood on it. Young said he knew the woods; we told him if we could cut the wood on the lots we would deliver it; he agreed to take it all if we would deliver it. The wood drawn to Paddleford, in 1858, was that in which I assigned my interest to the plaintiff; this wood, now at Paddleford, was from that lot."

Re-cross: "That conversation with Young was *at the time that contract was made*, either in the fall of 1856, or winter of 1857."

On the part of the defendants, Andrew T. Young, and others were examined, and their testimony tended to show,

that no contract was in fact made with the plaintiff for wood, at Farmington, and that the negotiation begun in October, 1857, contemplated the making of a subsequent written agreement, which the plaintiff declined to enter into, and that, although the plaintiff drew wood afterward, he was forbidden to pile it on the defendants' grounds, and therefore placed it on his own land; and that the company neither measured nor accepted it. Some evidence was given and other evidence was offered tending to show, that the defendants were fully supplied with wood from other parties, and that large quantities of wood were at that time drawn by owners to the line of the road and there piled, when no contract existed; probably with a view to a sale to the defendants when they desired to purchase.

It is unnecessary to give the testimony on the part of the defendants in detail, as the jury found for the plaintiff under a charge from the court which instructed them that, "If the jury should believe the version" (of the transaction) "as given by Young, the plaintiff could not recover; but that, if they believed the account of the transaction as testified to by plaintiff and his witnesses, he was entitled to their verdict." And again, "If you believe the testimony of the plaintiff and his witnesses, I recommend you to give him a verdict for all the wood delivered and not paid for."

Upon this the jury found for the plaintiff, for the wood both at Farmington and Paddleford, claimed for in the plaintiff's complaint.

Numerous exceptions were taken by the defendants to the charge, and to the refusal to charge as requested, which were deemed sufficient to raise the questions considered by the court on this appeal.

*Cox & Avery*, for the appellants.

I. The statute of frauds and perjuries should have protected defendants from this action.

1. The plaintiff himself, unsupported, testifies to mere talk of Young, and Young denies it, and shows it to be quite different.

2. There was no unequivocal act either of delivery or of acceptance. This is essential to a passing of the title of the wood; inasmuch as this is an action for wood sold and delivered; not an action for refusing to take wood bargained for.

*a.* As for the wood at Paddleford, it had been drawn by Smith and Brown, after their contract with the company had been filled and discharged.

This wood remained; and in March, 1859, Brown assigns to Smith his (B.'s) interest in the wood.

*b.* This written contract obviously contemplates inspection, measurement, approval and acceptance, before the wood becomes the property of the company.

Suppose it had been burned up by accident, it would have been the loss of Smith and Brown. (*McConihe* v. *Erie R. R. Co.*, 29 N. Y. 497; *Andrews* v. *Durant*, 1 Kern. 35.)

Because these rights had not been waived, the title of the wood was not passed.

Defendants, if in these circumstances forced to purchase, had still the right to inspect the wood; to compare it with the terms of the contract; to object to rough or rotten wood, short wood, basswood, hemlock, etc., and to refuse to take, unless the objectionable wood was thrown out, or to refuse to take it all and abide an action for damages.

*c.* This contract was executory; it transferred no title to a stick of wood.

Nor was title transferred by the drawing and piling. Suppose they had drawn three times the quantity called for by the contract. Which sticks would have been theirs, and which ours?

But this written contract is professedly the basis of the action. Plaintiff swears that he relied upon Young's verbal adoption of its terms, and drew the wood in question on the strength of such verbal adoption.

The complaint also proceeds upon this old contract as to terms of payment. Again:

*d.* This Paddleford contract had been filled and exhausted in 1857; it had no longer any force; what wood remained there belonged to Smith and Brown. Brown sold out his

interest in the wood, March, 1859, to plaintiff. Now, when did the title of that wood ever vest in the defendant?

As to the Farmington wood:

*e.* Plaintiff swears, that " *Young told him he might draw it in on the old contract*," referring to the contract of Smith and Brown. He swears, "that he relied *on that, and drew in the wood on that.*"

*f.* Taking it as plaintiff swears, then we have an executory, verbal contract adopting all the terms of the old written contract.

But we have seen (*ante*) that by that contract the wood was to be inspected, passed upon, measured, accepted, etc. by the general wood agent before the title changed.

*g.* The case is full of badges indicating that the wood had never been accepted by the company.

Begs Young to measure it.

Transfers 125 cords to Devoll, in April, which Devoll sells to us on his contract. Young helps him in this to favor him.

He frequently asks them to measure it. Tells Young that he has 200 more cords to draw. Young wished him not to draw it on. He would draw it on.

Plaintiff sends his brother to see to the measurement of his wood.

Defendants offer to buy it. Offer not accepted.

Offers to get the levy removed if the company will purchase it.

The purchaser from the sheriff offers to sell it to the company, authorizes the plaintiff to dispose of it, etc.

So, after the second sale on execution, offers to sell as agent for the plaintiff.

Jared Smith (the father) offers to sell it to the company; they refuse to buy. Again, in the winter of 1859-'60.

II. The Farmington wood in question was properly seized by the sheriff on execution against plaintiff.

(*Mem.*) That which was drawn out of the woods at the time of the levy, is not in question; for we purchased that of Devoll, and took it away, at plaintiff's request, as has been shown.

*a.* For the wood in question was all lying in the woods just as it was chopped; none of it was drawn. The sheriff was bound to levy on it. Who has the hardihood to say that the title of that wood had passed to the company?

*b.* And it was the duty of the sheriff to sell it to the highest bidder. Suppose that wood had greatly risen in value, would it have been ours?

*c.* Suppose that he had taken it away while under the sheriff's levy, and had paid Smith for it, would not the sheriff have had an action against us for conversion? Would not such taking have been tortious?

III. The charge of the court was erroneous, and calculated to mislead the jury.

As to the facts:

1. For there is no proof that Young "*did any acts*" of acceptance of the wood in question. The judge coolly authorizes the jury to impute the acts of plaintiff to Young.

2. The fact that we bought of Devoll all that was drawn out adjacent to the track, at the time of the levy, is ignored.

3. It suggests that the levy was "got out of the way" — which was not the case.

4. It assumes that this is an action for "*refusing to take* the wood (conceding, what indeed is sufficiently conspicuous, that the company did not take it.)

5. It declines to distinguish between the wood of Smith and Brown at Paddleford (as to which there is no show at all of transfer of title to defendants) and the Farmington wood.

As to the law:

1. It disregards the statute of frauds, and dispenses with the necessity of an "*unequivocal act of acceptance.*" (*Shindler* v. *Houston*, 1 Comst. 250, compared with *Hyman* v. *Cook*, 1 Howard's Ct. of App. Cases, 447 — the Horn-tips case; *Archer* v. *Zeh*, 5 Hill, 200.)

A constructive acceptance is not sufficient. (3 Barn & Ald. 680; 5 id. 855; *Ely* v. *Ormsby*, 12 Barb. 572; *Brabin* v. *Hyde*, 32 N. Y. 519.)

It suggests that "*doing nothing*" and "*saying nothing*" may be regarded as an act of acceptance.

2. It disregards defendants' rights of inspection, and objection to the quality and quantity of the wood, which were obviously retained by defendants and had never been waived. (*Crofoot* v. *Bennett*, 2 Comst. 260.)

3. It holds that the measurement (obviously contemplated by the parties), was all that remained to be done, and was in these circumstances no more a part of the acceptance, than the mere arithmetical calculation after the quantity had been ascertained.

(Numerous references omitted.)

This is no case of goods to be hereafter manufactured. (9 Barn. & Cress. 561, 566; 4 Maule & Sel. 262, 4; *Downs* v. *Ross*, 23 Wend. 272; *Mixer* v. *Howell*, 21 Pick. 205; *Smith* v. *Surman*, 9 Barn. & Cres. 561.)

4. The charge assumes that the levy was made upon plaintiff's wood, and then instructs the jury that "if the levy was got out of the way"—the defendants would be bound to take it — the only question before the jury being, whether the defendants had in fact taken it.

5. It instructs the jury that the defendants were "bound to take wood" presented on a void contract.

6. It implies that the verbal contract made between Young and Smith, had the effect of a covenant running with the wood, and holds that we were bound to take it from the purchaser even after the second levy; the only question being whether we had in fact accepted it. (*Story* v. *Brennan*, 15 N. Y. 524.)

IV. The court should have dismissed the complaint or ordered a verdict for defendants when the proofs closed for reasons stated.

Each of these reasons will appear upon examination to be sound.

V. The court erred in each of the various refusals to charge as requested by defendants' counsel.

VI. The admission of the written contract was erroneous. The objection was taken several times.

*a.* Because plaintiff's case claims to recover under it by a verbal adoption of its terms.

He said, "*draw in on your old contract.*" I relied upon that and drew in the wood upon that.

The courts hold steadfastly to the rule that the subscribing witness must be called. (*Hallenbecker* v. *Fleming*, 6 Hill, 303, and cases cited.)

Nor can it be proved by a party to it, in such case. (*Jones* v. *Underwood*, 28 Barb. 481.)

In conclusion: A more shameful disregard of the rights of a party under the forms of law, than is here exhibited, we have never heard of. The case bristles with sound exceptions. Here is a successful attempt, so far, engineered through the courts, to foist upon us, and force us to pay for $1,200 worth of wood which we have never had; and which, while lying in the woods, where it was chopped, was sold at sheriff's sale and paid the plaintiff's judgment debt once, and as to which, the only unequivocal act of acceptance established, or claimed, was, as stated in the charge, that Young "*said nothing*" while plaintiff was drawing it out (all under sheriff's levy), and piling it on his own land.

We have never bought this wood, and we ask for a reversal of this judgment upon the merits, so as to dispose of the case.

*E. G. Lapham*, for the respondent.

[The first five points of respondent's counsel relate to exceptions taken on the trial to evidence, which, being waived by appellant, are not pertinent to the case on this appeal. Besides, the exceptions being only referred to by the folios of the case, these points of counsel would not serve, if introduced, to elucidate the case. They are, consequently, omitted. The argument is, therefore, taken up at the sixth point.    REPORTER.]

The sixteenth and thirty-second exceptions are to the refusal of the learned justice to nonsuit the plaintiff, and, like certain exceptions to the charge, they present the question whether enough had been done in this case to answer the requirements of the statute of frauds; whether the con-

tract is within the provisions of that statute; and also as to the effect of the levy and sale by the sheriff. The main question is the one arising under the statute of frauds. I propose to examine it.

1. As a contract to manufacture the timber growing on the plaintiff's land, into wood, and to deliver it at the stations aforesaid. Viewed in this light the statute has no application. The agreement was to cut the timber off of specified lots, and furnish the wood from those to the company, and not for a sale of wood generally. (3 Selden, 349; *Crookshank* v. *Burrall,* 18 Johns. 58; *Bates and others* v. *Conkling,* 10 Wend. 390; *Sewall* v. *Fitch et al.,* 8 Cow. 215; *Parker, Agent Ins. Co.,* v. *Schenck,* 28 Barb. 38; *Groves* v. *Buck,* 3 Maule and Selw. 178.)

The defendant claims the contract as void as being a sale of standing timber. This is answered by the reasoning in *Pierpont's Exrs.* v. *Barnard* (2 Seld. 279).

If the point shall be made that Smith did not in terms agree to cut off the wood, and that the agreement lacks the element of mutuality, the case in 3 Seld., 349, affords the answer.

2. The delivery was complete. Nothing remained to be done by the plaintiff. Whenever the company were ready to pay, the measurement and estimate were made by it, not between it and the plaintiff. Nothing remained to be done by the plaintiff. (10 Wend. above cited; *Olyphant* v. *Baker,* 5 Denio, 379; *Shendler* v. *Houston,* 1 Comst. 251, and cases there cited; *Kimberly* v. *Patchin,* 19 N. Y. 330; *Waldron* v. *Romain,* 22 id. 368; *People* v. *Haines,* 14 Wend. 546; 6 id. 397.)

In the case in 1 Comstock above cited, which defendant quoted as his authority at the circuit, it is held that "*mere words* are not enough." There must be some *act.* What is meant by this is well explained by the Supreme Court. (*Brabin* v. *Hyde,* 30 Barb. 260.)

3. The estimate and payment for the 125 cords was an acceptance of part, which clearly takes the case out of the statute. The fact that it was included in Mr. Devoll's esti-

mate does not affect the question. That was merely for convenience in keeping the accounts of the company. The estimate and payment were made to the plaintiff; so if the Paddleford wood was in part taken and used by the defendant. (*Vincent* v. *Germond,* 11 Johns. 283; *McKnight* v. *Dunlop,* 1 Seld. 537; *Allen* v. *Aguire,* 3 id. 543.)

4. The first exception to the charge was not warranted thereby. There was no such instruction. The second exception is a part only of a sentence or topic of the charge, and is unfounded. The exception represents the judge as saying the plaintiff *shows* acts, etc., of Young. The charge merely recites the plaintiff's *claim.* So the third is unwarranted by the charge as given. It involves a very different proposition from the charge itself. The fourth, fifth and sixth exceptions are embraced under points already considered. The seventh is not warranted by the charge. Believing the testimony of the plaintiff alone, or his evidence, and that of his witnesses, are very different statements. The whole charge not being in the case, these exceptions are harmless.

5. The exceptions taken to the ruling of the court upon the various requests to charge, are equally unavailable to the defendant.

These requests, which it is obvious were prepared with especial reference to technicalities, and mere matters of form, and were hastily read to be passed upon at the conclusion of the charge, should not be viewed with favor. Again, they cannot be considered, as they were requests to modify the charge already made, and were so treated, and the whole charge is not given. (*Mayor of New York* v. *Fire Insurance Co.,* 9 Bosw. 424; 1 Seld. 422; 2 id. 233; 3 id. 266; 4 id. 37; 5 id. 37; 1 Kern. 61, 416; 2 id. 319; 33 N. Y. 47, 52.)

6. The above authorities clearly dispose of the first, second, fourth, fifth, sixth, eight, thirteenth and sixteenth requests. The refusal to charge the seventh request was proper. But even if error, the error was cured by charging afterward according to the twelfth request. The ninth request was properly refused. So of the eleventh. So of the fourteenth, seventeenth and eighteenth. These refusals were proper, as

the requests may have been mere repetitions of the charge just given. Or on the ground the requests should not be charged without qualification. (*Bagley* v. *Smith*, 10 N. Y. 489, 499; *Carpenter* v. *Stilwell*, 1 Kern. 79.) Or on the ground that the requests granted were themselves qualifications of the proposals refused, as they clearly were.

WOODRUFF, J. A careful examination of the testimony in this case is rendered necessary, by reason of the manner in which it was submitted to the jury. The late learned and highly esteemed justice of the Supreme Court, before whom the cause was tried, instead of confining himself to a statement of the legal principles which govern the rights of the parties, and submitting such questions of fact to the jury as were necessary to the application of these principles, or, as the parties desired to have submitted, preferred to instruct the jury, in a more summary manner, that, if they believed the testimony of the plaintiff and his witnesses, the plaintiff was entitled to recover, and in substance, that he was entitled to recover for the wood both at Farmington and Paddleford. This enables the appellant to review the plaintiff's evidence, in examining the question whether it is true, as matter of law, that, if the plaintiff and his witnesses testified truly, the plaintiff's right to such a recovery is clear.

There was very decided conflict between the testimony on behalf of the plaintiff, and the testimony on the part of the defendants. It therefore follows, that, if no error was committed on the trial in the acceptance or rejection of evidence, nor in the instructions of the court to the jury, the judgment must be affirmed. For, although diligent examination of the evidence, which was rendered necessary by the manner the case was submitted to the jury, has made me greatly doubt whether the defendants ever purchased the wood in question, or ever received or accepted delivery thereof, or of any part of it, it is not within our jurisdiction to reverse the judgment on the ground, that the jury erred in their estimate of the preponderance of the evidence.

On the argument of this appeal the counsel for the appel-

lants say: "Many exceptions were taken to the admission of irrelevant evidence, which, although supposed by the defendants to be well taken, and as such are relied upon, will not be specially further noticed here, *as defendants desire to have this case disposed of on the merits.*"

We regard this as a waiver of all those exceptions.

One objection, however, the counsel has treated as not included in the class referred to, but to relate to the competency of evidence, going to the merits of the controversy, viz., to the question, whether any, and, if any, what, contract was made between the parties? That exception we are, therefore, called upon to consider; and it raises the question, was it competent to read what is called throughout the case the "old contract," in evidence, without proving the execution thereof by a subscribing witness?

That depends, in my judgment, singly and solely on the question, whether any of the wood for which this action was brought, and for which recovery was had, was embraced within that contract and delivered under it as a subsisting contract, out of which the obligation of the defendants to make payment arose.

Whether the plaintiff so claimed on the trial is not very clear.

The contract was dated December 1, 1856, and related solely to wood to be delivered by plaintiff and John T. Brown, at Paddleford. It bound them to deliver, on or before the 1st day of August, 1857, four hundred to six hundred cords of good, sound, first quality wood, * * and fifty to seventy-five cords of second quality wood, * * split, piled, etc.

The plaintiff, examined in support of his own claim, testified: "Brown and I delivered at Paddleford *under the written contract,* in the winter of 1856, 1857, and 1858. There is in the neighborhood of 150 cords that has not been measured or paid for. This is the last contract made with the company. Most of that wood lies on the ground of the company; some of it is in the highway. I was at home every time that previous measurements were made under that contract."

The assignment from Brown to the plaintiff also conforms

to this statement, though it describes a less quantity. Thus: Brown assigns "all my right, title and interest to about fifty cords of wood, be the same more or less, which is now corded or piled up at Paddleford's wood station, * * being the same wood cut on the premises, bought of Huldah Goodell by said W. Barclay Smith, *and drawn and delivered at said station, under a contract made between* W. Barclay Smith and John T. Brown, with said railroad company."

Although the wood was not drawn until after the first day of August, 1857, the time of delivery mentioned in the contract, nevertheless, if the plaintiff claimed to recover therefor on the ground, that it was drawn, delivered and accepted under that contract, as the testimony of the plaintiff and the assignment of Brown both state, then it is clear that the contract was the operative instrument by which to determine the rights of the parties. In this view the contract was not a matter collateral to the cause of action, but must be directly proved in order to a recovery, and as much so as if the claim had been to recover for wood delivered under it before August 1st, 1857; and it follows, that, in this view, it was not competent to read the contract in evidence, as the operative contract upon which the plaintiff sought to recover, unless, nor until, its execution was proved by the subscribing witness, or the failure to produce the witness was properly excused.

On the other hand, the plaintiff's witness and co-contractor, Brown, gives a different account of the matter. He says, that, prior to August, 1857, they had not drawn enough to fill their contract, and that, in the fall of 1857, they drew the remainder; that it was received *and paid for.*

The theory upon which the contract was received in evidence was, that the wood at Paddleford, claimed for in this action, was wood drawn there in 1858, after the written contract had been completely performed, and was in excess of the quantity called for by that contract.

What, then, was the contract or agreement on the part of defendants for this excess? The testimony of the plaintiff excludes the idea that the wood was in excess when he represents it as delivered under the written contract; but his

witness, Brown, represents, that when the written contract was made, Young, the defendants' agent, wished him to make the contract for 5,000 cords, and that, when plaintiff and Brown declined doing so (stating that they would not bind themselves to bring more than they could get out, but that he, Brown, thought they could get out more than was called for by the contract), Young told them to "bring it on and he would take and pay for all they could get on" [*query*, out ?]. "He agreed to pay for all we should deliver, more or less." "The lot was one we purchased with the wood on it, and Young said he knew the woods. We told him if we cut the wood on the lots we would deliver it. Agreed [*query*, he agreed ?] to take it all if we would deliver it. * * This wood now at Paddleford was from that lot. That conversation with Young was *at the time that contract was made*, either in the fall of 1856, or winter of 1857."

This is the evidence relied upon as showing that the defendant purchased the wood at Paddleford, for which the plaintiff claimed to recover in this action, and it is, manifestly, upon the theory, that this wood was delivered in excess of the quantity mentioned in the written contract, and was delivered upon the idea, that this conversation with Young warranted the plaintiff and Brown in delivering all that could be cut from that wood lot, and bound the defendant to receive and pay therefor; that the plaintiff was deemed at liberty to put the written contract in evidence, to ascertain the price and other terms of the parol agreement.

If the reception of the contract in evidence, without calling the subscribing witness, depended solely upon this testimony and its relation to the Paddleford wood, I should greatly doubt the correctness of the ruling.

It permits the inquiry whether, when it is shown that the parties negotiated and entered into a written contract for the purchase and sale of from 400 to 600 cords of wood, one of them can be permitted to prove, that at the same time the parties verbally agreed that the quantity of wood might be increased by the seller to a larger number of cords, and that the excess should be paid for upon the terms and at the price

named in the writing, and to establish this state of facts, give the writing in evidence without proving its execution.

The objection, that all verbal negotiations and stipulations are merged in the writing, forbids any such proof. But as this objection does not appear to have been specifically taken on the trial, the question recurs, was it competent to give the contract in evidence on the other grounds urged?

If, then, it be assumed that such a verbal contract could be made concurrently with the execution of another agreement in writing, and it is necessary, in order to ascertain the price and terms of the verbal agreement, to produce the writing, is it necessary to prove the execution of the writing, or will it be sufficient to identify it as the writing to which the verbal agreement refers?

This presents the same question as was raised by the proof as to the Farmington wood. The plaintiff alleged, that in October, 1857, nearly one year after the execution of the agreement, Young agreed to buy the Farmington wood from him, upon the terms of the "old contract," *i. e.*, the contract made by plaintiff and Brown.

Here, I think it clear, that the case presented an agreement lying wholly in parol, some of the terms of which were contained in a writing used by way of reference, not as containing any operative words of obligation, but as rendering the verbal agreement definite in details.

In this aspect, it is wholly immaterial whether it is signed or not. It is referred to, not as the obligation of the parties, but as a memorandum, showing what obligations the parties verbally assume.

For illustration: Parties agree verbally upon a sale of wheat, and that the price and place of delivery shall be the same as are specified in the memorandum book of the superintendent of a certain mill. Now, it is of no consequence how informal that memorandum may be, nor whether signed by any one. When that memorandum is produced it serves, not to show an obligation, but to fix the terms of an obligation resting wholly in parol, which is thereby definite and certain.

This is true of any paper which, by reference, is made part of a verbal contract; all that is necessary is to identify it as the paper referred to, and when identified it serves the purpose of the reference, whether signed or not signed, whether formal or informal.

There was, therefore, upon the theory on which the case was tried, no error in permitting the written contract to be read for the purpose of fixing the terms and details of the alleged parol agreement.

The principal question arising on the merits relates to the validity of the parol contracts, and the effect of what was done by the agent of the defendants.

It is quite clear, that the alleged contract for the purchase of the wood was within the statute of frauds. The claim of the plaintiff to treat it as an agreement for work and labor in manufacturing firewood out of standing trees, cannot prevail. It would be indecorous to say that distinctions on that subject have in some instances been made, which seem rather designed to evade the provisions of the statute than to guard against the evils which the statute was designed to prevent. There would seem no very sensible reason for holding, in reference to two verbal contracts with wagon makers for the purchase and delivery of twenty wagons on a future day named, that one is void because the one wagon maker has the wagons on hand, and the other is valid because the other wagon maker must manufacture them in order to their delivery at the time appointed. Without, however, disregarding the cases which hold that, where the substance of the contract is work and labor to be done in converting materials into a new and totally different article, it is not within the statute; we may say that there is no just notion of manufacture involved in an agreement to deliver a specified number of cords of firewood. No change in the thing sold and to to be delivered is contemplated. The circumstance that it stands in the woods at the time, involves nothing more than a necessity to cut it, that it may be delivered. In this respect it is not different from a purchase and agreement to deliver wood of a prescribed length, split into pieces of convenient

size, the parties knowing and· intending that delivery shall be had of wood already cut, but of a greater length and not split at all.

It does not differ from a sale of wheat not yet threshed, held to be within the statute. (*Downs* v. *Ross*, 23 Wend. 270.) In the case of *Garbutt* v. *Watson* (5 Barn. & Ald. 613), where a sale of flour by a miller was held within the statute, although not yet ground when the bargain was made, the Court of King's Bench regard the substance of the transaction, viz., a sale of goods, and not the mere incident that some labor would be necessary to enable the seller to deliver; and regard the case of *Towns* v. *Osborne* (1 Strang, 506), where the agreement was for the sale of a chariot not yet manufactured, as an extreme case, which ought not to be carried any further. And in *Smith* v. *Surman* (9 Barn. & Cres. 561), where the agreement was for the sale of timber, the trees from which it was to be cut then standing on the vendor's land, the Court of King's Bench held, 1st, that it was not a sale of growing trees, so as to be a sale of land, or an interest in or concerning the same, but, 2d, that it was a sale of goods within the statute. BAILEY, J., says: "The vendor, so long as he was fitting it and preparing it for delivery, was doing work for himself and not for the defendant." LITTLEDALE, J., says: "Where the contracting parties contemplate a sale of goods, although the subject matter at the time of making the contract does not exist in goods, but is to be converted into that state by the seller bestowing work and labor on his own raw material, that is a case within the statute. It is sufficient, if, at the time of the completion of the contract, the subject-matter be goods, wares and merchandise." I cannot assent to any case which has decided that such a contract is not within the statute.

But without entering further into the discussion of the broad proposition stated by Justice LITTLEDALE, or the differing views expressed in our Supreme Court in *Downs* v. *Ross*, I think that here is no just pretense for calling the agreement one for work and labor to be done for the defendant, and that it is plainly within the statute.

If, then, the alleged verbal bargain between the plaintiff and Young, the defendants' agent, for the purchase of wood at Farmington, was within the statute, it was void, and the defendants were not bound thereby.

If liable at all, it is because the plaintiff delivered, and the defendants accepted the wood. The case was sent to the jury upon that view of the law governing the case.

If the case had been submitted to them to determine, upon all the evidence, whether the defendants accepted the wood, or any part of it, as a delivery under the agreement, and the jury had found affirmatively, the only question in this court would be, was there any evidence to warrant the submission of the question to the jury?

But the question submitted was, whether the jury believed the plaintiff and his witnesses, or believed the agent of the defendants, Young; and they were told that if they believed the former, the plaintiff was entitled to recover; that, if they believed the latter, the defendants were entitled to their verdict.

I think that there was error in this, which may have operated to secure to the plaintiff a verdict to which he was not entitled; for, as it appears clear to me, the jury may have credited the plaintiff's testimony, and it yet be certain that there was no acceptance of this wood or any part of it.

1. In the first place, as to the Farmington wood: According to the plaintiff's statement, Young, in October, 1857, after examining the trees in the woods, consented to take the wood, and proposed to draw up a contract therefor; the plaintiff declined, declaring his unwillingness to bind himself in case he should accept a situation at the West. Young told him that if he did not stay at the West and should return, he might draw it on the old contract. This was neither assented to nor refused by the plaintiff. And, manifestly, at this time, there was no contract whatever. If there were no statute of frauds, here was not even a verbal contract which bound the parties to any thing. Afterward, without any renewal of negotiations, or even notice to the defendants of any intent to accept Young's proposal, the plaintiff began to

cut the wood, and in February he began to draw wood to Farmington station, and, seeing Young, asked his consent to deliver wood on his own (the plaintiff's) land, and Young consented. As no wood was delivered anywhere else, it is a just inference that this was before any wood was actually drawn. To this stage nothing had transpired which conferred title on the defendants, or which could have prevented the plaintiff making any disposition of the wood which he saw fit; there was nothing which could be construed to be an acceptance of the wood. All that Young had said was prospective.

The actual deposit of wood on the plaintiff's land, near the station, in pursuance of the consent thus given, was not, *per se*, an acceptance, and yet nothing else took place until the plaintiff was, according to his own testimony, distinctly informed by Young that he could not measure the wood which had been brought, because the plaintiff had no written contract; this was about the 22d of February. It may be true that, had the wood been accepted, the fact that the old contract, which is claimed to have been made, by reference, a part of the parol agreement, contemplated a measurement by the defendants to ascertain the sum to be paid, would not prevent a recovery by the plaintiff when the defendants refused to measure; but it is a significant fact that this contract in terms contemplated approval and acceptance by the general wood agent. It was thus one of the very terms of the writing which the plaintiff relies upon to fix the details of the parol agreement, that there should be an actual acceptance before the plaintiff should be entitled to payment for the wood—a refusal to accept without just cause, might make the defendants liable for a breach of contract, but without such actual acceptance the wood would not be theirs, nor would they be liable as for wood delivered and accepted. So the statute, where the agreement is by parol, contemplates some act, or at least assent of the purchaser, either contemporaneous with, or subsequent to, the act of the vendor which constitutes delivery on his part, which act or assent indicates acceptance of the thing sold.

Here the first act or declaration of the defendants' agent after the consent that the wood be delivered on the plaintiff's own land, was substantially a refusal to accept it.

To my mind, it is quite apparent from the testimony of the plaintiff and his witnesses, that it was the act of measuring the wood to which he and those of his witnesses who delivered wood, all looked as the act which made the wood the property of the defendants, and entitled them to payment.

With the consequences of a refusal to accept where there was a binding contract, we have nothing to do in this case.

There is no pretense, moreover, that the general wood agent, the very person who, as contemplated by the written contract referred to, was to accept, ever saw the wood, or consented to receive it.

To return to Young : Having distinctly informed the plaintiff that he could not measure the wood because there was no written contract, he also informed him that he was going to Albany, and would induce the general wood agent to allow him to measure the wood.   Whatever inferences the plaintiff had been theretofore warranted in drawing from the acts of Young, touching his authority to bind the defendants by purchasing and accepting the delivery of wood, the plaintiff was now distinctly apprised, that, there being no written agreement binding the company, because he had refused to enter into such an agreement, he (Young) had no authority to act in the matter without the authority of the general wood agent, by whom under the written contract, the wood was to be accepted.   He told the plaintiff that he could not measure it, but was going to Albany, and would induce the general wood agent to allow him to do so.   Unless acceptance may be inferred not only without the affirmative act or assent of a party, but against his will, here was no acceptance.

Doubtless the plaintiff believed that the approval and acceptance of the general wood agent would be obtained by Young, for he continued to draw wood, but he had become apprised that his wood was not accepted on the mere act of

drawing and depositing, and that Young could not measure it, because there was no contract binding the company to receive it. All that took place afterward is in harmony with this; Young constantly declined to measure it, but encouraged him to believe that he would do so at a future time.

The levy of the sheriff upon all the wood which had been drawn and deposited down to the 22d of March, was acquiesced in by the plaintiff, a fact wholly inconsistent with the idea that the wood had then been accepted by the defendants. The expedient which was devised by Young, in kindness to the plaintiff, and to assist him in his embarrassment, viz., to deliver the wood to Devoll, who had a written contract with the defendants, that thereupon Devoll might deliver the wood under his contract, and then the agents of the defendants could measure it and pay Devoll therefor (whose payment in turn to the sheriff, would tend to relieve the plaintiff); — all this is quite inconsistent with the idea that the wood had, by acceptance, already become the property of the defendants.

All this the jury may have believed, and there is nothing in the other testimony given by the plaintiff and his witnesses, which is not consistent with this. How, then, could it with propriety, be sent as matter of instruction to the jury, that if they believed the plaintiff and his witnesses, the plaintiff was entitled to recover?

I am not discussing the evidence under any idea that we are at liberty to review a finding of fact upon the evidence, but only for the purpose of seeing whether the evidence warranted the instruction given by the court. A verdict for the plaintiff was not the necessary legal result of accrediting the plaintiff and his witnesses. On the contrary, the jury, upon the foregoing recited testimony, might have found that the defendants never accepted the wood, and their verdict in that case would have been sustained, and, in my judgment, would have been in most plain conformity to the testimony of the plaintiff himself.

Courts should always, so far as they have power, prevent the statute of frauds from being made itself the instrument

of fraud; here the plaintiff was in no such peril. He refused to become bound by a written agreement, and he was very early apprised of its importance by the notice that the agent, Young, could not measure his wood, because there was no such contract.

If the testimony given on behalf of the defendants be considered, there can be no pretense of fraud.

2. The claim of the plaintiff to recover for the wood at Paddleford, stands upon much more slender grounds, and, to my mind, the testimony in regard to that wood, in no wise warranted the instruction to the jury which I have considered.

If any wood was delivered at Paddleford by the plaintiff and Brown, which was not embraced in the written contract, — and this the testimony of the plaintiff himself makes doubtful, — the alleged contract therefor, and the only contract therefor, appears by the testimony of the plaintiff's witness, Brown, to have been made cotemporaneously with the making of the written contract.

It is liable not only to the objection, that if made, it was verbal and void by statute, but to the further objection, that it is an attempt where the parties had in writing agreed to a purchase, and for a delivery of a quantity of wood named in the writing, to insist upon a cotemporaneous parol agreement that the vendor might deliver a greater quantity than the instrument mentioned.

Nevertheless, if a greater quantity was delivered and accepted, the defendants would be bound to pay therefor; but the plaintiff's proof shows no such acceptance, beyond the mere fact that it was drawn to and piled up at the station, and that James Brady, who was in charge of a hand car at that station, told the teamster where to pile it; — unless it be found in Brady's testimony, and he was therefore examined by the plaintiff. He says that " all his orders from Mr. Shaw were to have all the wood that was drawn at that place put close to the track, so as to be got at, and that he told Gilhooly (the teamster), the same as Shaw told him "— that he " was not authorized by Shaw to accept any wood

from any body," and that he never did any thing with plaintiff's wood except what he told Gilhooly about piling.

Now it must be conceded that where the defendants have legally contracted for the purchase of wood to be delivered at a station, and to be piled as specified in the writing, it is their duty to have some one at the station at the time appointed for delivery, to direct as to the place for piling, and if they have no such agent there, the vendor would be at liberty to pile it without such orders, in any place reasonably convenient for the purposes of the defendants.

.But to say that where there is no binding contract of purchase, the general instruction of Shaw (conceding his authority to accept wood not legally contracted for, which is not very clearly proved), would warrant Brady in any act binding them to pay for wood not purchased, I cannot agree.

The mere piling the wood by the plaintiff and Brown, however it may have constituted delivery on their part, was not *per se* acceptance by the defendants, and Brady is one of their witnesses referred to in the instruction in question. He did not assume to buy wood, or to accept wood which had not been purchased; on the contrary, he says he had no authority to accept any wood. He did not assume to direct as to the place of piling wood which had not been purchased; he says he supposed the plaintiff or Gilhooly had a contract.

All the plaintiff's subsequent efforts to induce the agents of the defendants to measure the wood drawn there in excess of the quantity mentioned in the written contract, failed, and I think that the plaintiff's testimony on this subject, so far from establishing acceptance, proves rejection.

In my judgment, the testimony of the plaintiff and his witnesses, in respect to both parcels of wood, fails to show either a valid contract therefor, or an acceptance thereof by the defendants, upon any contract, express or implied, and whatever inferences the jury might have drawn on the subject, I think it was error to instruct them that if they believed those witnesses, the plaintiff was entitled to recover;

they might have believed these witnesses, and have yet come to the conclusion that there was no such acceptance.

The judgment should be reversed, and a new trial ordered.

All concur except CLERKE, J., and BACON, J., not voting.

Judgment reversed.