# The Passaic Manufacturing Company v. William Hoffman et al.

Where a contract is for an article coming under the general denomination of "goods, wares, or merchandise," and it is made with one who manufactures and sells that kind of commodity to all who traffic in it, the quantity required and the price being agreed upon, it is *a contract of sale* within the meaning of the statute of frauds, and it is unimportant whether the manufacturer and vendor has, when the order for the article is given, the requisite quantity on hand or has to manufacture it afterwards.

If, however, what is clearly contemplated by the contract is the skill, labor, care, or knowledge of the one who fabricates the article, or if it would not have been produced, if the order had not been given for it, or if, when produced, it is un-

fitted for sale as a general article of merchandise, being adapted only for use by the person ordering it, then the contract is one for work and labor, and is not within the statute of frauds.

If an order is given to a manufacturer for a certain quantity, at a certain price, of an article which he is habitually manufacturing and keeps on hand to supply orders, it is, in general terms, to be regarded as a contract of sale, and should be in writing to make it binding. But if, with the knowledge that the manufacturer is not supplied with the article ready made, the party orders a certain quantity to be manufactured at a certain price, then it is an agreement for the production of the article, and not for the sale of it after it is produced.

The meaning of the words "goods, wares, and merchandise," and " chattels," in the statute of frauds, considered.

The plaintiffs agreed to manufacture and deliver fifty warps to the defendants at a fixed price, and, it appeared upon the trial, (1) that the articles were of a peculiar kind; (2) the number contracted for was to be produced and delivered as the defendants wanted them ; (3) they were all manufactured after the order for them was received ; (4) the agreement contemplated that the articles were to be of the plaintiffs' manufacture. *Held*, not a contract of sale required to be in writing, within the statute of frauds.

It is not necessary that the memorandum in writing of the contract, under the statute of frauds, should be comprised in one paper. It may be embraced in several, but they must be connected with, and refer to, each other, and the mutual relations of the writings must appear upon their face, and cannot be established by parol evidence.

The defendants proposed, by letter, that the plaintiffs should accept an order for fifty " warps," at a certain price, and the acceptance of the order was by letter, but the contents of this letter, as well as the fact that it was mailed to the defendants, was established by parol evidence, no exception being taken to the evidence. *It seems* that this was sufficient proof of an acceptance in writing.

It appearing, however, that twelve of the " warps " had afterwards been delivered to, and accepted by, the defendants, *held*, that there was a sufficient part delivery to take the case out of the operation of the statute.

Upon the refusal of the defendants to accept the residue of the goods, the plaintiffs had a right to sell them at auction and hold the defendants responsible for the deficiency.

APPEAL by the defendants from a judgment entered upon the report of a referee.

This action was brought to recover the difference between the contract price of thirty-eight " warps," and the price realized at an auction sale of the goods, upon the defendant's failure to receive them under the alleged contract. The defendants

by their answer denied the allegations of the complaint, and alleged that the contract was null and void under the statute of frauds. The action was referred to Livingston K. Miller, Esq., and upon the trial it appeared that the plaintiffs were manufacturers of cotton duck and yarns, that on the 26th March, 1867, they received from the defendants the following letter :

" You may fill an order and repeated orders for us, if you can do so, on the terms on which all the warps have been furnished (and now furnished) for us past three years, and at lowest market price. For all the warps we purchase in one month, if you will allow us to pay the amount of that month's statement at the end of the following month, we will purchase of you, and you will find, as all others do, that we pay promptly. We want No. 30 warps, and the 600 yards to weigh 40lbs. Will you please answer us here, and inform our Mr. Wilson at the mill if you wish to serve us ?"

To which the president of the plaintiffs answered by mail as follows :

"I will make you 100 warps No. 30, averaging 40lbs. each, at 70 cents per lb., on the terms of payment you propose, viz. : cash at the end of the month following the month of delivery. This price is as low as I have heard of them having been sold for, and I suppose will be satisfactory."

The defendants, on the 27th of March, replied as follows :

" *Dear Sir :* Shall have word from our man to-morrow as to our present and immediate wants. Meantime, we wish you to accept an order for 50 warps instead of 100, at the price 70 cents, and if cotton (the moment this order is filled) is no lower beyond question, you will have our order for the 50 more, making one 100. Please answer you will start so. Finding your warps uniform, we shall be faithful to you and serve."

The president of the plaintiffs wrote on the 28th or 29th of March, 1867, accepting the order for 50 warps, at 70 cents, without imposing any conditions, and directed the superintendent to notify Wilson, the defendants' agent, of the order received. The plaintiffs made 12 warps, and delivered them to

the defendants, and received the contract price therefor, and on the 30th April, 1867, they notified the defendants that the rest of their order of 50 warps (38) were finished, and that they would send them to defendants' factory.   To this the defendants replied as follows :

"*Gents:* We beg leave to say that we accept *no warps* which you may have made without orders and contrary to any statement of ours.   When we want warps, we order them or send for them, and when we don't order them, and when the *price of cotton*, upon which any order was based as a price, is so much lowered, the case is altered, and, too, the manufacture of nets, for the present, has long since ceased with us.   Warps, concerning which you are so anxious to sell, were not made for us any more than for any other manufacturer, and we have authorized no manufacturer to pile up warps for us, but that as we wanted them we would order."

The letters of each party were signed by them.   Upon the 19th of June, 1867, the plaintiffs sent a written notice to the defendants that the 38 warps would be sold at auction on the 21st day of the same month, at a designated place and hour. The auction sale was advertised for four days in two newspapers. Upon the sale the warps brought only 43 cents per pound, or $446.61 less than the contract price, to recover which the plaintiffs brought this action.

It was shown on the trial that the plaintiffs were in the habit of manufacturing that kind of "warps," but seldom kept them on hand ; that there was no market price for such warps at the time of the auction sale, they not being standard articles and a kind of goods not generally sold at auction.   The plaintiffs had an order for such goods about a week before the sale, but they did not fill it with the "warps" made for the defendants, although they could have done so at 50 cents a pound, because they wanted the goods sent to the auctioneer to fix a price upon them, and find out *how* much their claim on the defendants would be.   It was also shown that the goods were worth 60 cents per pounds on the day of the auction sale.

The referee reported in favor of the plaintiffs, and the cause

having been sent back to the referee, by the Court, to report upon certain questions of fact, he further reported as follows:

I. That the class of goods referred to in the pleadings herein are usually sold at private sale, and not at auction.

II. That the plaintiffs were, at the times mentioned in the complaint, manufacturing and selling the class of goods referred to, to other parties, and could have sold the goods in question, at private sale, for a higher price than they realized at auction; but, in the view I have taken of the case, I cannot find that said goods were therefore sold at a useless sacrifice.

III. I do not find in the evidence anything to justify me in holding that the plaintiffs acted in bad faith in selling such goods at auction.

From the judgment entered on the report, the defendants appealed to the general term.

*Jacob F. Miller*, for appellants.

I. The alleged contract was void under the statute of frauds. (1.) There was no memorandum in writing subscribed by the parties to be charged thereby. (*Dykers* v. *Townsend*, 24 N. Y., 57; *Brabin* v. *Hyde*, 32 N. Y., 519.) (2.) There was no part payment. According to the plaintiffs' demand they were not to receive their pay until a month after the delivery of the goods. (3.) Nor was there a delivery of a part of the goods at the time of making the alleged contract. When Mr. Wilson received the twelve warps he knew nothing of the terms of any contract, but received these warps some time subsequent to the making of the alleged contract. There is no pretence that there was any conversation or correspondence connecting the receipt of the goods with any previous conversation or correspondence. Hence the case of *Bissell* v. *Balcom* (39 N. Y., 275), does not apply. (4.) If the contract was void the voluntary performance of a part would not render it obligatory on the defendants to perform the rest. (*Baldwin* v. *Palmer*, 10 N. Y., 232.)

II. If the first letter of the defendants was ambiguous or did not express their original intention, it was explained by their last letter. This letter was not answered by the plaintiffs.

By their silence admitted the defendants' construction of their previous correspondence to be correct, and by it a modification of the alleged contract was effected. *Qui tacet consentire videtur.* (*Mactier* v. *Frith*, 6 Wend. 119.)

III. The alleged contract cannot be sustained as an order for goods to be manufactured, and therefore a contract for work and labor and not a sale of goods, so as to avoid the statute of frauds, for these were a class of goods kept on hand or manufactured for customers generally. The alleged contract was within the statute. (Browne on Frauds, §§ 303, 307, 308, 308a; *Wilks* v. *Atkinson*, 6 Taunt. 11; *Garbutt* v. *Watson*, 5 Barn. & Ald. 613; *Mixer* v. *Howarth*, 21 Pick. 207; *Lambs* v. *Crofts*, 12 Met. 356; *Atwater* v. *Hough*, 29 Conn. 508; *Gardner* v. *Joy*, 9 Met. 177; *Downs* v. *Ross*, 23 Wend. 270, 273; *Smith* v. *N. Y. Central R. R. Co.*, 4 Keyes, 200.)

IV. But if there was a valid contract between the parties, it was broken on the second day of May, 1867. The measure of damages then is the difference between the contract price and the market price of the goods at that time. No evidence was given by the plaintiffs touching the price of such goods, at or about that date, and therefore no damages are shown. (*Masterton* v. *Brooklyn*, 7 Hill, 62, 71, 76; *Hein* v. *Wolf*, 1 E. D. Smith, 73; *Huntington* v. *O. & L. C. R. R. Co.*, 33 How. Pr. 419; *Dana* v. *Fiedler*, 12 N. Y. 48; *Shannon* v. *Comstock*, 21 Wend. 457; *Wilson* v. *Martin*, 1 Denio, 602; *Spencer* v. *Halstead*, *id.* 606; *Clark* v. *Marsiglia*, *id.* 317; *Durkeae* v. *Mott*, 8 Barb. 423; *Costigan* v. *Mohawk R. R. Co.*, 2 Denio, 610; *Heckscher* v. *McCrea*, 24 Wend. 304.)

V. The plaintiffs might have sold at private sale the warps for nearly, if not quite all the alleged contract price, but they neglected to do so. They waited a month and a half after they knew the defendants would not take the goods before they sold them, during all which time such goods were on the decline. They did not take ordinary care in the sale of the goods; such care as prudent persons take of their own affairs. The plaintiffs never sold any of their own goods in this way. *Crooks* v. *Moore*, 1 Sand. 297, 303; *Pollen* v. *Le Roy*, 10 Bosw. 38; 30 N. Y. 557; *Lewis* v. *Greider*, 49 Barb. 638,

The Passaic Manufacturing Company v. Hoffman.

639; *Hamilton* v. *McPherson*, 28 N. Y. 76; *Buck* v. *Burk*, 18 N. Y. 342.)

VI. The plaintiffs should have called upon the defendants to take the warps, or in default thereof, signified their intention to sell them on account of the defendants, giving them notice of the time and place of sale. The only evidence of the intention to sell was a letter, but there is no evidence that this was ever served on defendants. The notice in the newspapers was published only four days. (*McEachron* v. *Randles*, 34 Barb. 301.)

*Merchant & Elliott* and *R. C. Elliott*, for respondents.

I. The letters of the parties established a valid contract between the parties, by which the plaintiffs were to manufacture and furnish to the defendants forty warps of a certain number and weight, at seventy cents per pound, and the defendants agreed to receive the warps and pay therefor seventy cents per pound. (1.) This contract is not within the Statute of Frauds relating to the sale of goods. (2.) It was not a contract for the sale of goods, but to manufacture and furnish of a certain character and description not in existence when the contract was made; in other words, a contract for work, labor, and materials, which has been uniformly held in this State not to be within the statute. (*Crookshanks* v. *Burrell*, 18 Johns. 57; *Sewall* v. *Fitch*, 8 Coll. 215; *Donovan* v. *Willson*, 26 Barb. 138; *Parker* v. *Schenck*, 28 Barb. 38; *Robertson* v. *Vaughn*, 5 Sandf. 1; *Parsons* v. *Loucks*, 4 Robt. 216; *Mead* v. *Case*, 33 Barb. 202.)

II. This contract, even if we concede it to be for the sale of goods within the statute, is not void under the Statute of Frauds. (1.) Because it was subscribed by both parties in the true sense of the statute; it consisted of the letters on each side, those on the part of the plaintiffs being subscribed by plaintiffs, and those on the part of the defendants by them. (2.) Because a portion of the warps, to wit, twelve of them, were delivered to, and accepted and received by the defendants under the said contract. (*McKnight* v. *Dunlop*, 5 N. Y. R. 537; *Gray* v. *Payne*, 16

Barb. 277 ; *Sprague* v. *Blake*, 20 Wend. 61 ; *Sale* v. *Darragh*, 2 Hilton, 184.) (3.) Because the defendants paid a portion of the purchase money, to wit, for the said twelve warps delivered.

III. The plaintiffs did all that was requisite under the contract to entitle them to recover. (1.) They manufactured the goods pursuant to the contract, and delivered a part of them, which were received and paid for by the defendants, and they requested the defendants to receive the balance, which the defendants refused. (*Vaupell* v. *Woodward*, 2 Sandf. Ch. 143 ; *Bunge* v. *Koop*, 5 Robt. 1 ; *Wheeler* v. *Garsia*, 5 Robt. 280.) (2.) Although after such refusal, the plaintiffs were not required to make a tender of the balance of the warps 38, yet they did so. The defendants having refused to recive the balance of the warps, and pay for them pursuant to the contract, the plaintiffs had the right to resell them, and to charge the defendants with the deficiency. (Long on Sales (Rand's Ed.), 239, 241, 449 ; *McLean* v. *Dunn*, 4 Bing. 722 ; *Sands* v. *Taylor*, 5 Johns. 395 ; *Hunter* v. *Talbot*, 3 Smedes & Marsh, 754 ; *Dixon* v. *Yates*, 5 B. & Ad. 313 ; *Rowley* v. *Bigelow*, 12 Pick. 307 ; *Crooks* v. *Moore*, 1 Sandf. 297 ; *Bement* v. *Smith*, 15 Wend. 497 ; *Pollen* v. *Le Roy*, 30 N. Y. 549 ; *Lewis* v. *Greider*, 49 Barb. 638.)

IV. The mode of sale adopted by the plaintiffs was in all respects proper. It was by auction, and the defendants were duly notified. In addition to this, the sale was advertised in two newspapers. The plaintiffs acted in perfect good faith, and in advertising and notifying the defendants, they did more than the law required them to do. The referee finds that the plaintiffs acted in good faith.

By the Court.*—Daly, Chief Justice.—The first question, and indeed the main one in this case, is whether the contract upon which the action was brought, was void by the Statute of Frauds. It involves these inquiries, (1.) whether the contract was one within the statute ; (2.) if it was, whether there was a

---

* Present—Daly, Ch. J., Van Brunt and Loew, JJ.

sufficient note or memorandum in writing, and (3.) whether there was that partial delivery and acceptance of a portion of the goods which the statute requires.

What the statute has in terms declared void is, every contract for the *sale* of goods, chattels or things in action, for the price of fifty dollars or more, unless there has been a partial delivery and acceptance, or a payment of some part of the purchase money, or a memorandum in writing subscribed by the parties;—but simple as this enactment is, the greatest difficulty has been experienced in determining, in many cases, what is a contract for the sale of goods and chattels, within the meaning of this provision. At an early period, a distinction was made between a contract for the sale of an article, and one for the fabrication or manufacture of it; the latter, in general terms, being regarded as a contract for work and labor, and not a contract of sale, though the article when manufactured and ready for delivery would, as a personal chattel, come under the denomination of goods, wares, or merchandise.

Thus where a party contracts for the production of something, in which the skill and labor of the person who fabricated it, is combined with the material which he employs, as in the production of a statue or of a painting, in which the material is comparatively unimportant, and the skill and labor is the chief ingredient, it was regarded as a contract for work and labor, and not for the sale of the painting or the statue, even though the price to be paid had been previously agreed upon.

In the case here put by way of illustration the distinction is obvious; but there are many contracts in which work or labor has to be performed after the contract is entered into, which are, in their inception, contracts for sale and do not lose that character, because work and labor have to be executed to perform them. Work and labor may be necessary in the delivery of the thing sold, or in putting it in a condition for delivery, which is very different from work and labor bestowed in the creation or production of the article contracted for. But even in the latter case, the contract may be in its nature, one

of sale. It is a matter of every day occurrence that contracts are made for the purchase, at a fixed price, of a certain quantity of goods from those who manufacture them for the general purpose of sale as an article of traffic, which the manufacturer is not able at the time to supply, but which he undertakes to furnish by a given time, or as soon as that quantity can be manufactured; which have been regarded as essentially contracts of sale within the meaning of the statute, and as fully within the mischief which it was intended to guard against, as if the article had existed *in solido* when the contract was made for the sale of it. But where the contract is for the production of an article of a peculiar kind, or it is the skill, labor, care or knowledge of the person or manufacturer who is to produce it, which is relied upon, then, it is the manufacturing, which is the chief ingredient, and which, in this country at least, is regarded as making it a contract for work and labor, and not one for the sale of the article.

It is, however, sometimes very difficult to determine whether the contract is simply for the product itself, as an article of trade, or for the peculiar skill, care or knowledge which is to be bestowed in the production of it. The case now before us is one that involves that inquiry, and as there has been considerable conflict in the authorities as to what is or is not a contract of sale within the meaning of the statute, it will be necessary to inquire into the present state of the law, and amid the conflict of adjudged cases, ascertain the rules that now govern in the interpretation of the statute.

It may be stated as the result of several well considered cases that where the contract is for an article coming under the general denomination of goods, wares or merchandise, and it is made with one who manufactures and sells that kind of commodity to all who traffic in it, the quantity required, and the price being agreed upon, it is a contract of sale, and that it in no way affects the character of the contract in such a case, whether the manufacturer and vendor has, when the order is given, the requisite quantity on hand or has to manufacture it afterwards. (*Gardner* v. *Joy*, 9 Met. 179; *Lamb* v. *Crofts*, 12 *id.* 356; *Atwater* v. *Howe*, 29 Conn. 508; *Eichelberger* v.

*McCauley*, 5 Har. & Johns. 213; *Cason* v. *Cheely*, 6 Geo. 514; *Garbut* v. *Watson*, 5 Barn. & Ald. 613; *Smith* v. *Surnam*, 9 Barn. & Cres. 561; *Watts* v. *Friend*, 10 *id.* 446; *Wilks* v. *Atkinson*, 6 Taunt. 11; *Jackson* v. *Covert*, 5 Wend. 140; *Smith* v. *N. Y. Central Railroad Co.*, 4 Keyes, 180.)

But if what is clearly contemplated by the agreement is the skill, labor, care or knowledge of the one who fabricates the article or commodity, or if it would not have been produced if the order had not been given for it, or, if when produced, it is unfitted for sale as a general article of merchandise, being adapted only for use by the person ordering it;—then the contract is one for work and labor, and is not within the statute. (*Spencer* v. *Cone*, 1 Met. 283; *Mixer* v. *Howarth*, 21 Pick. 207; *Hight* v. *Ripley*, 19 Maine, 139; *Cummings* v. *Deunet*, 26 *id.* 401; *Allen* v. *Jarvis*, 20 Conn. 38; *Cason* v. *Cheely*, 6 Geo. 554; *Crookshanks* v. *Burrill*, 18 Johns. 59; *Cartright* v. *Stewart*, 19 Barb. 455; *Parker* v. *Schenck*, 28 *id.* 38; *Mead* v. *Case*, 33 *id.* 202; *Clay* v. *Yates*, 1 Hurl. & Norm. 73.)

The distinctions here presented are tests to determine whether a contract is or is not within this provision of the statute, though founded, as I have said, upon the authority of well considered cases, have not been very closely adhered to in this State, there being several decisions in our reports in which contracts have been upheld as contract for work and labor, not upon the ground that what was contemplated was the skill and labor of the one who was to furnish the article, but because the article was not *in solido* when the contract was entered into, but was to be made afterwards, either in whole or in part, from the raw material. Thus, in *Sewell* v. *Fitch*, (8 Cow. 215,) an order was given to the plaintiff's agent for 300 casks of 'Thames cut nails' at $5\frac{1}{2}$ cents per pound, and the agent having stated, when the order was received, that the plaintiffs had not that quantity on hand, but that it could soon be made and obtained from the plaintiff's manufactory, in Norwich, Connecticut, it was held not to be a contract for sale, but for work and labor.

The contract in this case of *Sewell* v. *Fitch* might, perhaps, have been sustained upon the ground that 'Thames cut nails'

was an article of a peculiar kind which the plaintiffs manufactured, or one, the distinctive quality, or especial excellence of which may have been owing to the skill, ingenuity or experience of the plaintiffs as manufacturers; but this was not the reason given by the court, nor so far as indicated by the report, was there anything in the case except the specific name, "Thames cut nails," to distinguish this particular article from nails in general.

*Sewell* v. *Fitch* was followed in the still more doubtful case of *Downs* v. *Ross*, (23 Wend. 270,) Bronson, J., dissenting, in which a contract for a certain number of bushels of wheat at ten shillings per bushel, was upheld upon the ground that a part of it was then unthrashed, which the vendor agreed to get ready, as well as to give the whole of it a second cleaning, and deliver the entire quantity by a specified day—a case, however, which must now be regarded as repudiated since the recent decision of the Court of Appeals in *Smith* v. *The N. Y. Central R.R. Co.* (4 Keyes, 199,) in which a contract for a quantity of wood, at a certain price per cord, which was thereafter to be cut from standing trees, measured into cords, and delivered at a railroad station, was held to be a contract of sale within the meaning of the statute, and not one for work and labor.

The decision of the Supreme Court in *Sewall* v. *Fitch*, though regarded as erroneous, was followed by the Superior Court of this city in an analogous case, *Robertson* v. *Vaughan* (5 Sandf. 1). The court adhered to it simply because it had been decided for many years, and had doubtless been followed in numerous instances by inferior tribunals in the State, and, under these circumstance, it was thought better that the error involved in the decision should be left to be corrected by the court of last resort. It was also followed in *Donovan* v. *Wilson* (26 Barb. 138), the same reason being assigned, that the error should be corrected by the Court of Appeals. These reasons are now no longer of any weight, the decision of the Court of Appeals in *Smith* v. *N. Y. Central R. R. Co.* (*supra*), being directly in conflict with the construction put upon the statute in *Sewall* v. *Fitch*.

A brief review of a few cases will suffice to illustrate the construction given to the statute. Thus the early and much discussed case of *Towers* v. *Osborne* (1 Strange, 506)—the report of which simply states that the defendant bespoke a chariot, and, *when it was made*, refused to take it—has been upheld, upon the ground that the chariot which was ordered to be made would never, but for that order, have had any existence (*per* Abbott, C. J., in *Watson* v. *Garbutt*, 5 Barn. & Ald. 613), which Woodruff, J., considered an extreme case that ought not to be carried any further (*Smith* v. *N. Y. Central R. R. Co., supra*); but in *Mixer* v. *Howarth* (21 Pick. 207), where all that was done by the defendant was to select the lining which was put upon the carriage, it was held not to be a contract for the sale of the carriage within the meaning of the statute. An analogous case to both of these was *Crookshank* v. *Burrill* (18 Johns. 58), in which the plaintiff contracted to make the wood work of a wagon, for which the defendant was to pay in lambs at a certain price per head, which was held not to be within the statute. In *Parker* v. *Schenck* (28 Barb. 38), the defendant directed a pump to be manufactured in a peculiar way, so as to adapt it to a use to which he meant to apply it; which was deemed sufficient to make it a contract for work and labor. In *Parsons* v. *Louck* (4 Robt. 216), the agreement was for the manufacture thereafter of ten tons of paper, at a specified price per pound, the paper to be of a particular description, and of such sizes and weights as the defendant should thereafter direct by letter; which was also held to be a contract for work and labor. Analagous to this was the case of *Hight* v. *Ripley* (19 Maine, 139), where the plaintiff was to furnish a quantity of malleable hoe shanks according to *patterns* left with him, in which a like decision was rendered. In *Mead* v. *Case* 33 Barb. 202), the defendant selected a marble monument, consisting of several parts, which were put together, and stood in the plaintiff's yard or shop. By the defendant's instruction, it was polished and an inscription cut upon it, embracing the names of the defendant's deceased father, mother, and sister, that it might be put as a memorial over their place of burial. This was held not to be within the statute. E. Darwin Smith,

J., dissented in an elaborate opinion, but the decision was clearly correct, as the monument, when the epitaph or inscription which the defendant desired was cut upon it, was fit only for use, in that state, as a memorial to indicate the burial place of his relative. It was converted into a thing capable of being used only by himself or by his connections, and, in that state, was unavailable to the plaintiff for sale as an article of merchandise.

To illustrate what is within the statute, the case of *Cason* v. *Cheely* (6 Geo. 554), may be cited. In that case, the agreement was for a crop of cotton to be delivered as soon as it could be gathered and prepared for market. The court held it to be a contract of sale and not of work and labor, for, said the court, the work and labor would have been bestowed in the production of the article if the contract had not been made ; and they distinguished it from the making or production of an article unsuited to the general market, likening it to the case of the manufacture of goods wherein the manufacturer does not necessarily lose the result of his labor, for the reason that if the purchaser does not take the goods, others will. To the like effect are the cases of *Garbut* v. *Watson* (1 Dow. & Ky. 219; 5 Barn. & Ald. 613); *Smith* v. *Surman* (9 Barn. & Cres. 561); *Watts* v. *Friend* (10 *Id.* 446); *Lamb* v. *Crofts* (12 Mat. 356); *Wilks* v. *Atkinson* (6 Taunt, 11); *Smith* v. *N. Y. Central R. R. Co.* (4 Keyes).

In *Atwater* v. *Hough*, (29 Conn. 508), it was held that a contract for one hundred sewing machines, part of which was not finished, but which were to be completed and delivered in the course of the summer, was a contract of sale, within the meaning of the statute ; and the same construction was put upon the contract in *Gardner* v. *Joy*, (9 Met. 179), in which the defendant asked the plaintiff his price for candles, and the plaintiff named it ; the defendant then ordered one hundred boxes, upon which the plaintiff replied, that the candles were not then manufactured, but that he would manufacture and deliver them in the course of the summer, and this was held not to be an agreement for work and labor, but a contract of sale. It is what may be called a very close case, as well as the one that

precedes it, *Atwater* v. *Hough*, (*supra*), both of which, however, should be distinguished by the fact that it does not appear in the report of either case, that it was *any part* of the bargain that the vendor should manufacture the articles contracted for. (Browne on the Statute of Frauds, § 307: *Eichelberger* v. *McCauley*, 5 Har. & Johns. 213.) This fact was especially relied upon as distinguishing the agreement for the manufacture of the malleable hoe shanks in *Hight* v. *Ripley*, (*supra*), from an ordinary contract of sale; the court remarking that in contracts like the one before them, "the person ordering the article to be manufactured, is under no obligation to receive as good, or even a better, and of the like kind, purchased from another and not made for him. It is the peculiar labor and skill of the other party, combined with the materials, for which he contracted, and to which he is entitled." And in a later case, in the same State, (*Cummings* v. *Dement*, 26 Maine, 401), the distinction is laid down more broadly in these words: "If the application is made to a manufacturer or mechanic for articles in his line of business, and he undertakes to prepare and furnish them by a given time, such a contract, though not in writing, is not effected by the statute," and Chief Justice Shaw, by whom the opinion of the court was delivered, in *Gardner* v. *Joy*, (*supra*), in a later case, (*Lamb* v. *Crofts*, 12 Met. 356), declared the distinction to be as follows: "Where a person stipulates for the *future sale* of articles which he is habitually making, and which, at the time, are not made or finished, it is essentially a contract of sale, and not a contract for work and labor; otherwise where the article is made *pursuant to the agreement*." The distinction here shown serves to explain and limit the previous decision of the same court in *Gardner* v. *Joy*, (*supra*); but, as a rule, it is not very clear, or very satisfactory.

It may be stated as a conclusion to be derived from these cases, that if an order is given to a manufacturer for a certain quantity, at a certain price, of an article which he is habitually manufacturing and keeps on hand to supply orders, it is, in general terms, to be regarded as a contract of sale, and should be in writing to make it binding; for the party giving such an

order is not called upon to inquire what quantity the manufacturer has on hand, or whether it will or will not be necessary to manufacture it, in whole or in part, to fulfill the order. But if with the knowledge that the manufacturer is not supplied with the article ready made, the party orders a certain quantity to be manufactured at a certain price, then it is an agreement for the production of the article, and not for the sale of it after it is produced; for it may be that but for the order, the manufacturer would not, at that time, in the ordinary prosecution of his business, manufacture such a quantity for the reason that it may, by the time it is manufactured and ready for delivery, depreciate in value in the market, as was the fact in the case now before us. "*Ex æquo et bono*," says Nisbett, J., in *Cason* v. *Cheeley* (*supra*), "a man who agrees to bestow his labor in the manufacture of goods for a price, and which price he must lose unless the goods are received by him who ordered them, ought to be paid, and a statute which would protect the purchaser from liability in such a case, would be alike impossible and unjust." It might be answered that the mechanic or manufacturer can protect himself by having the contract put in writing; but that is evading the inquiry, the question being whether the statute in terms includes such a case, and, in my judgment, it does not. "It would," says Robertson, Ch. J., in *Parsons* v. *Louck* (*supra*), "be a somewhat novel and startling doctrine to decide that a tradesman must have every contract put in writing with his customers to manufacture articles in which he deals, such as articles of dress or furniture, in order to bind the latter to pay for them;" and yet the statute has been carried to this extent in a recent decision in England (*Lee* v. *Griffen*, 1 Ellis, B. & S. 272), in which it was held that an agreement for the making of a set of artificial teeth to be fitted to the mouth of the person ordering them, was not an agreement for work and labor, but a contract of sale, and was void for not being in writing. Indeed of late years, the judges, especially in England, with the design, as they express it, of bringing the statute back to its true interpretation, are disposed to go to such lengths in holding cases to be within it, that its construction is in a fair way

of becoming now more uncertain than ever. "I do not," says Crampton, J., in this case of the artificial teeth, " agree to the proposition that the value of the skill and labor, as compared to that of the material supplied, is any criterion by which to decide whether the contract is for work and labor, or for the sale of a chattel. It bears a strong resemblance to that of a tailor's supplying a coat, the measurement of the mouth and the fitting of the teeth, being analogous to the measurement and the fitting of a garment." Hill, J., went farther. " Whenever a contract is entered into," he says, " for the manufacture of a chattel, there the subject-matter of the contract is the sale and delivery of the chattel, and the party supplying it cannot recover for work and labor,"—a conclusion which, if followed, would overturn a number of American cases ;—indeed every one I have cited which was held not to be within the statute. Justice Blackburne, who also concurred in this judgment, undertook to lay down a rule, to distinguish what was and what was not within the statute, or rather what was a contract of sale as distinguished from one for work and labor. " If the contract be such," he says, " that when carried out it would result in the sale of a chattel, the party cannot sue for work and labor, but if the result of the contract is that the party has done work and labor which ends in nothing that can become the subject of a sale, the party cannot sue for goods sold and delivered." He gives the case before the court of the artificial teeth, as an illustration of the first part of this rule, and of the second, the case of an attorney employed to prepare a deed, in which case he says, " it cannot be said that the paper and ink he used in the preparation of the deed, are goods sold and delivered." *(A see p Griffin)*

The effect of the rule here laid down is, to convert every case of work and labor into a contract of sale, if the result of the work and labor be a product or moveable thing, which is capable of transfer by delivery—a construction, in my judgment, unwarranted by the language which was used in the enactment of the Statute of Fraud, and the sense in which that language has been interpreted by judicial decision for more than a century and a half.

What the statute declared must be in writing to be valid, was any contract for the *sale* of *goods, wares,* or *merchandise* for the price of £10 or upwards. What was meant by these words, *goods, wares,* and *merchandise,* at the time of their enactment, not simply their etymological meaning, but what was understood by them in their popular and in their legal sense, may be ascertained by referring to the English dictionaries by which they were first defined. They are not to be found in the earlier works, for the reason that the first English dictionaries were limited to the explanation of foreign or unusual words, or, as expressed in their titles, were "expositors," or "interpreters of hard words."

The earliest work in which the meaning of words in ordinary and popular use was given is " Phillip's New World of Words," the first edition of which appeared twenty years before the passage of the statute. In this work, I quote from the sixth edition, which appeared after the passage of the statute, the meaning of the word *merchandise* is given as follows : "commodities or goods to trade with ;" and this exact definition is given in the succeeding dictionaries of Kersey, Martin, and Bailey. It is said, in the *Glossographia Anglicana Nova,* that the word came into use as a term to designate the goods and wares exposed to sale in fairs and markets, which is affirmed also in *Cowell's Law Interpreter,* edition of 1708. The word " wares " is defined for the first time in Cotgrave's Dictionary, of 1632, as " merchandise," and in Phillip's New World of Words, as " merchandise, commodities ;" and this is the definition successively given to it down to the time of Johnson ; showing that, up to the middle of the last century, it was regarded as having exactly the same meaning as merchandise : and, indeed, such would seem to have been the understanding of Johnson, who defines it, " commonly, something *to be* sold."

The first exposition I have found of the word " *goods* " is in Bailey's large dictionary of 1732. He defines it simply " *merchandise ;*" and by Johnson, who followed as the next lexicographer, it is defined to be " moveables in a house, personal or moveable estate, wares, freight, merchandise."

The Revised Statutes of this State substituted the word " chattels " for " wares or merchandise," but, like many other changes of language in the revision, this was evidently for conciseness, and not with a view of changing the sense (see Notes to Rev. Stat., pp. 84, 85.) The lexicographers and other authorities cited show that what was understood by the words " goods, wares, or merchandise," when the statute was enacted and for a century afterwards, were the commodities bought and sold in trade and commerce, which would not include a set of artificial teeth, as they are not bought and sold in that way, but made only for the person ordering them. There is no very material difference between the dentist who removes the decayed teeth and replaces them with an artificial set, which he makes and adapts to the mouth of the particular person, and the surgeon who replaces a broken limb, or performs any of those operations by which a lost or decayed part of the human body is replaced, as to restore the nose, when it has been lost, by skillfully drawing the skin down from the forehead, and by that operation constructing a new nose of the shape and appearance of the former one. They are both acts of work and labor, and to call either of them contracts of sale is to ignore the distinction which separates an agreement for work and labor from a contract for the sale of a thing. There is nothing in a set of artificial teeth which the dentist fabricates for the mouth of the person who orders them, that is capable of sale in the ordinary course of trade or commerce, unless it should be the materials of which they are composed ; and this may be said of Justice Blackburn's illustration of the deed which the attorney draws, as the paper upon which it is written is capable at least of sale for use in the paper mill. In fact, it has been held in this country that the paper upon which a deed or note is written, makes it a chattel, irrespective of what is written upon it, so as to bring it within the words of a statute authorizing suits to compel the delivery of " goods and chattels." (*Mills* v. *Gore*, 20 Pick. 28 ; *Clapp* v. *Shephard*, 23 *Id.* 228 ; *Baldwin* v. *Williams*, 3 Met. 367.)

The case of the ordering of the chariot (*Towers* v. *Osborne*, *supra*); appears to be the first reported case under the 17th

section of the statute. The contract there was held not to be within it, for the reason that the enactment meant only a contract for the actual sale of goods, where the buyer is immediately answerable, without time given him by special agreement, and the seller is to deliver the goods immediately. This case was decided within fifty years after the passage of the statute, and Lord Loughborough, in commenting upon it in *Rondeau* v. *Wyatt*, (2 H. Bl. 67,) said " that it was plainly out of the statute, because it was for work and labor to be done and materials and things to be found, which is different from a mere contract of sale, to which species of contract alone the statute is applicable." Here the line of separation is clearly marked, affording a broad distinguishing rule, which was recognized and acted upon for more than a century after the passage of the act.

Indeed, this was understood to be the proper construction of the statute, and to be the law both in this country and in England thirty years ago, by a jurist so careful, accurate and eminent, as Chancellor Kent, who, in the text of his commentaries, says, " that if the subject of the contract does not exist in *rerum naturâ*, at the time of the contract, but remains thereafter to be fabricated out of the raw materials, or materials not put together, it is consequently *incapable* of delivery, and not within the statute ;" and subsequently in a note, after examining the English and American authorities, he deduced from them what he supposed to be the rule, as follows : " If the articles sold exists at the time *in solido*, and is capable of delivery, the contract is within the statute, but if the article is to be afterwards manufactured or prepared by work and labor for delivery, the contract is not,"—(2 Kent's Com. 4 id. 504, 511*n*.), a rule which had, at least, the merit of a well defined distinction, easily understood, and which could be readily applied, but which, in the reactionary movement that has since taken place, has even in this country been materially departed from.

In the early part of the last century a question arose whether stocks or shares in a mining company were " goods, wares or merchandise," within the meaning of the seventieth

section, and the ground upon which the objection was raised, that merchants trafficed in stocks, and at that time, 1725, very largely, may be adverted to as explanatory of the meaning that was then attached to these words. The point was not then determined, the judges being equally divided, and it remained unsettled in England until about thirty years ago, when it was finally decided that stocks were not, within the statute, " goods, wares or merchandise," " because," said the Vice Chancellor, Sir Lancelot Shadwell, (*Duncruft* v. *Albrecht*, 12 Sim. 198,) " goods, wares or merchandise are capable of being in part delivered. If there is an agreement to sell a quantity of tallow or hemp, you may deliver a part, but the delivery of a part is not a transaction applicable, as I apprehend, to such a subject as railway shares," and this decision was affirmed by the Lord Chancellor. Stocks bought and sold by oral agreement, are as fully within the evil which the statute meant to suppress as the making of a set of artificial teeth could be, and if the reason which excepts the former from the operation of the statute is, that they are *incapable* of delivery in part, it equally applies to a set of artificial teeth, or any other separate or entire thing which cannot be delivered in part.

This ground of exception, the incapability of a partial delivery, has been distinctly repudiated in this country, and it has been held in Massachusetts and Connecticut, that stocks or · shares in an incorporated company are embraced by the words, *goods, wares* and *merchandise ;* that there is nothing in the nature of stocks or shares, which in reason and sound policy, should exempt contracts respecting them from the operation of the statute ; that so large an amount of property is now invested in them, and as the ordinary *indicia* of property arising from delivery cannot take place, there is a peculiar reason for extending the provisions of the statute to them; that the circumstances, they cannot be actually accepted and received, is not at all conclusive, and would be a wrong and forced construction of the statute. (*Tisdale* v. *Harris*, 20 Pick. 13 ; *North* v. *Forest*, 15 Conn. 401, and see *Calvin* v. *Williams*, 3 Har. & J. 38.) The grounds, therefore, upon which the Eng-

lish Court of Chancery, in the case cited, and the common law courts, in *Humble* v. *Mitchell*, (11 Adol. & Ell. 205 ; and *Tempest* v. *Kilner*, 2 Mann. Gr. & Sc. 300), held that stocks were not within the statute, is relied upon in the American cases, as an especial reason why they should be included.

It has been decided in Maine that the sale of a promissory note is within the statute, and in New Hampshire that it is not. (*Gooch* v. *Holmes*, 41 Maine, 523 ; *Whittemore* v. *Gibbs*, 4 Fost. N. H. 484.) It has been held in England that the sale of a patent right, a very important species of property at the present day, is not within the statute, (*Chanter* v. *Dickinson*, 5 Man. & Gr. 253,) whilst if the decision in the New England cases I have cited respecting stocks is to be followed, it certainly would be.

This state of things in respect to the construction and meaning of a provision in a statute which has been in existence for nearly two centuries, is not now very pleasant to contemplate in view of what has been the experience of the past respecting it. " No act," says Mr. Evans in his notes to the collection of the statutes, " has been productive of greater litigation in settling its construction." Daines Barrington said seventy-five years ago, that it was the common impression then, that it had not been expounded at a less expense than one hundred thousand pounds, and Chancellor Kent about forty years afterwards, was of the opinion that it had then cost upwards of a million pounds sterling. Lord Nottingham thought every line of it worth a subsidy ; but he was the father of the act, or claimed the merit of having brought in the bill ; (*Ash* v. *Abdy*, 3 Swanst. 664.) whilst Lord Mainfield considered that important provisions in it, which ought to be plain to the meanest capacity, lacked the certainty requisite to make them plain to the greatest capacity, (*Cadogan* v. *Kennett*, Cowp. 434), and, certainly, the exposition which has here been given of the inconsistency and conflict that now exist as to what was meant by a contract for the sale of goods, wares, and merchandise, either brings this provision under the repeal of Lord Mansfield's observation, or shows the folly of disturbing the construction so long given to these words.

The judges who were first called upon to interpret them, were as competent as any of their successors, and as well, if not better informed of the mischiefs the statute was intented to remedy. " Great regard," says Coke, " ought, in construing a statute, to be paid to the construction of the sages of the law, who lived about the time, or soon after it was made, put upon it; because they were best able to judge of the intention of the makers at the time when it was made," (Dwarris on Statutes, p. 693), an opinion which before his day had been compressed into an axiom: *contemporanea exposita est optima et fortissima in lege.*

Chief Justice Best said in *Procta* v. *Jones,* (2 Carr. & P. 532), that "the Statute of Frauds was much objected to at the time of its passage, and that the judges appeared anxious to get rid of it, but in later times became desirous to give to it its full effect;" and this loose statement, made upon a trial at *niso prius,* has recently been followed up by Justice E. Darwin Smith in *Mead* v. *Case,* (33 Barb. 206), who says that " the English courts started off and long continued in the practice, if not in the theory, of regarding the statute unfavorably, and its simple text was persistently for many years nullified, perverted, or evaded by numerous decisions." No reference is made by either of these judges to any authority for this statement, and I have looked in vain over the contemporary period for anything to corroborate it. Chief Justice Best made the remark above quoted, a century and a half after the statute was passed. He could have no better means of information than we possess, and so far from finding either of these statements sustained, the result of my examination convinces me, that the judge interpreted the statute in no hostile spirit whatever, but experienced great difficulty in understanding some of its provisions, from what is now universally conceded to have been the imperfect manner in which the act was drawn ; and it is difficult to see, why they should seek to " evade and nullify" the seventeenth section, when the effect of having contracts in writing, was greatly to abridge their own labors by releasing them from the difficulties incident to interpreting agreements founded only upon parol testimony.

The courts of equity have also been assailed for invading the statute, because they compelled the performance of parol agreements where the agreement is admitted by the defendant in his answer. But courts of equity exercised this jurisdiction upon the ground that, as the statute, as was expressed in its title, was " An act for prevention of frauds and perjuries," there could be no danger of fraud or perjury when the defendant admitted the agreement. (*Symondson* v. *Tweed*, Prec. in Chc. 374.) But this was denied in the law courts by Lord Loughborough, upon the ground that compelling the party to answer put him under a great temptation to commit perjury by denying the agreement, and, upon the further ground, that the prevention of perjury was not the sole object of the act, but "to lay down a clear and positive rule for determining when the contract of sale was complete, to prevent confusion and uncertainty in the transactions of mankind," which was adding an intention by interpretation, for the preamble of the act is in these words : " For prevention of many fraudulent practices which are commonly endeavored to be upheld by perjury and subornation of perjury ; be it enacted, &c." (29 Ch. II, c. 3), which would seem alike to be a very clear indication of the purpose for which it was passed and of the mischief it was designed to remedy, and, as far as it is relied on, is an answer to both of the grounds taken by Lord Loughborough. But weight was given by courts of equity to those grounds for insisting upon the application of the statute, and the rule, as first acted upon, was modified, by holding that notwithstanding the admission, the defendant might insist upon the statute and thus defeat any recovery upon the agreement, and though this seems to be very inconsistent, the rule, as thus modified, is now regarded as impregnably settled by authority. (Browne on Statute of Frauds, § 498.)

The rule in equity is at least settled. But in the courts of law, especially in the English courts, this important provision of the statute respecting contracts of sale, is as fully thrown open for judicial consideration and discussion as it was in the beginning, and, what the community have a right to expect, some stability in the construction of an enactment affecting all engaged in trade or commerce, or who follow those handicrafts

in which their labor and skill is combined with the materials they use, would seem to be regarded as of little consequence.

Under a system like ours, in which the rights of individuals are determined by positive rules and the authority of adjudged cases, it is of more importance that a rule of construction should be stable than that it should be logically correct, and if it is to be constantly fluctuating and uncertain, as appears now to be the tendency in regard to this provision respecting sales, it were as well to be relieved from the authority of precedents altogether and follow the nations that adhere to the systems of the civil law.

This disposition to extend the operation of the section respecting sales, over what may be regarded as at least doubtful or uncertain cases, arises from the desire to give to the statute greater effect, as I judge from the high eulogiums pronounced by judges upon the wisdom and policy of its provisions. It is not the province of judges to expound a statute according to their opinion of its wisdom and utility (Dwarris, 1 Evans, 211n.); but to declare what was enacted; what was the meaning and intention of the framers of the act, and, where that has been ascertained by judicial decision long acquiesced in, courts are not warranted in disturbing it upon the ground that greater effect ought to be given to the statute. This is not interpretation, but judicial legislation, and the only excuse that could be made for it, is the one now given, that the judges would not, after the passage of the statute, carry it out, or give effect to its provisions, which, so far as I can learn, has been assumed only from the construction put at the present day upon their decisions. It certainly cannot be applied to Lord Loughborough, who, in distinguishing the case of the ordering of the chariot as one of work and labor, and therefore not within the statute, took especial occasion to commend the wisdom of the provision therein respecting sales.

If this reactionary movement grows out of the belief that it will tend to coerce men in a greater degree to put their contracts in writing, it is a vain expectation, for, in the complicated and rapid transaction of business at the present day, men have neither the disposition nor the time to put all they agree to in

writing.   Large commercial transactions are entered into and consummated every day upon oral agreements that could not be legally enforced, the only effect of the statute being to keep such contracts out of the courts and to leave them to the good faith and integrity of the parties.

Whatever opinion may be entertained of the beneficial working of this provision of the statute as a general regulation, its effect in the courts is not to augment or promote commercial morality in the particular instances, for in my long experience in presiding at the trial of causes, I have almost invariably seen it resorted to to defeat a contract or engagement fairly entered into, when, by reason of the depreciation in value of the thing ordered, or like cause, it was found convenient to get rid of the obligation; and if the statute is to be carried now by judicial construction to the extent of declaring absolutely void, unless it is in writing, every engagement to make or pay for a thing, the possession or transfer of which can pass by delivery; if this is to enter into and govern in all the transactions of every day life, to every article ordered or requisite, in the supply of our wants, necessities or luxuries, then it is prescribing, as a condition to the validity of the transaction, what is simply impracticable—what will not and cannot be complied with, and the great bulk of such transactions will be practically left to the integrity of the parties, and the statute invoked in aid of those who wish to get rid of their engagements.

If, as we have a right to presume from the preamble, the object of the statute was to prevent frauds and perjuries, and as a means to that end, a contract of sale was not allowed to be established by oral testimony, because it was a kind of evidence that could be readily fabricated, and otherwise defective and uncertain, it is to be remembered that the rules, which regulate the introduction, the bearing and the weight of testimony, were more imperfectly understood then than they are now.   Baronet Gilbert's treatise upon the law of evidence was not published until three quarters of a century after the passage of the statute, and even that treatise, though extravagantly eulogized by Blackstone, is characterized now as " a very meagre production," (Marvin's Legal Bib. 384), and how little

the tests which are now every day applied to parol evidence were then understood, resorted to or allowed, is familiar to every one who has perused the State trials.

As a means of preventing fraud and perjury, the statute was founded in the same general policy which excluded the parties themselves from being witnesses, or any one who had the remotest interest in the result,—a practice which, after being tested and tried for several centuries, has been deliberately abandoned both in England and in this country, a change which so far from producing any injurious consequences has aided the administration of justice. " Great apprehensions," says Lord Mackenzie, in his recent work upon the Roman Law (p. 331, 2 ed.), " were entertained that these changes might open the door to perjury, but experience has demonstrated that the latitude allowed under the new system, all objections to credit being duly weighed, is, on the whole, highly beneficial, by enabling courts of law to reach the truth in a multitude of cases where the ends of justice were formally defeated by excluding the testimony of the parties best acquainted with the facts in dispute." Very possibly some such considerations, as those I have suggested, led a judge, so recent and so experienced as Lord Campbell, to declare that it would be better if the statute were abolished; to which may be added the remark of Lord Mansfield long ago, that the principles and rules of the common law, as developed and applied, were calculated to attain every end sought by the statutes against frauds. (*Cadogan* v. *Kennett*, Cowp. 434), and the observation of Coke that in his long career he had known but of two questions occurring upon the right of descent by the common law,—that the greatest questions arise not upon its rules and principles, but upon conveyances, wills, or instruments drawn by the unlearned, or upon statutes (Co. Rep., preface to Part II).

The enactment in the statute respecting sales may be a salutory one to protect men from having claims established against them by false testimony, or the proof of which rests only in human memory, and, it may be said, that it is, as a public regulation, productive of no especial injustice, where the omission to put the agreement in writing is attended by no other

effect than the failure to get the profit or advantage, that was anticipated from the sale. But if it is the understanding of both parties that an article is to be produced in whole or in a material degree, by the work and labor of one of them, which would not, at the time, have been bestowed but for their agreement;—then the refusal of the other party to take the article and pay for it when it is made, is not merely a failure on the part of him that produced it to get the anticipated benefit, but it may subject him to a direct and absolute loss, by the article being thrown upon his hands. Any rule of law, or any rule of construction that will sanction this, is unjust in its operation, and the public considerations upon which the statute was founded do not demand that it should be carried to this extent. It has required only contracts of sale to be in writing, and where work and labor has entered in any material degree into the creation of the thing bargained for, so as to make it doubtful whether it is a contract of sale or not, courts are not called upon to find nice distinctions, or resort to rigid rules of interpretation, that it may be brought within the operation of the statute, and declared void, because it is not in writing. *Jus summum sæpe est malitia*, is the observation of the Latin poet, and we are told by Coke that even poets may be cited as authorities in expounding the law. *Authoritates philosophorum medicorum et poetarum sunt in causis alleganda et tenenda.* (Co. Lit. 264.)

I have gone into this extended examination for the reason that the case now before us is a peculiar and a close one, as the statute is now interpreted. The plaintiffs were manufacturers of an article known as "warps," and the defendants of "market nets," an article in the fabrication of which, it would seem, warps were used. On the 25th of March, 1867, the defendants went to the plaintiffs, that the latter might fill an order for warps, and repeated orders for them, if they could do so, upon the terms upon which all warps had been furnished to the defendants for the preceding three years, and at the lowest market price, and that the defendants would pay for all the warps purchased in one month at the end of the following month. The next day the plaintiffs answered by letter that

they would make 100 warps for the defendants, at 70 cents per pound, upon the terms proposed, cash at the end of the month following the month of delivery ; to which the defendants replied by letter, that they did not know their immediate wants, but said, " meantime, *we wish you to accept an order for* 50 *warps*, instead of 100, at the price of 70 cents, and if cotton (the moment this order is filled) is no lower, you will have our order for the 50 more." Within two days after the receipt of this letter, the plaintiffs mailed their reply addressed to the defendants, advising them that the plaintiffs accepted the order for the 50 warps at 70 cents, and would agree to deliver another 50, if cotton were no higher or lower, at the expiration of the delivery of the first 50 ; which letter, having been duly mailed to the defendants, was sufficient notice of an acceptance on the part of the plaintiffs of the order for 50 warps. (*Vassar* v. *Camp*, 11 N. Y. 441 ; *Mactier* v. *Frith*, 6 Wend. 106.) Twelve of the warps were delivered during the months of March and April, having been sent for by the defendants' superintendent, and were paid for by the defendants. The remaining 38 were finished, and the plaintiffs requested the superintendent to receive them, but he did not. The plaintiffs then advised the defendant by letter, on the 30th of April, 1867, that the 38 had been finished some time ; that the superintendent had beeen requested to receive them, but did not, and that the plaintiffs would send them to the defendants' factory on a specified day, or sooner if requested ; to which the defendants replied by letter in these words : " We beg leave to say that we accept *no warps* which you have made without orders, and contrary to any statement of ours. When we want warps, we order them, or send for them ; and when we don't order them, and when the *price of cotton*, upon which any order was based as a price, is so much lowered, the case is altered ; and, too, the manufacture of nets, for the present, has long since ceased with us. Warps concerning which you are so anxious to sell, were not made for us any more than for any other manufacturer, and we have authorized no manufacturer to pile up warps for us, but that as we wanted them we would order." The disingenuousness of this treply is apparent. The letter

itself very clearly discloses that the reason why the defendants did not wish to take them was that they had no immediate use for them; that they had stopped the manufacture of nets, and that when they resumed it, they could, in consequence of the fall in the price of cotton, get their warps made at a cheaper rate.

The day after the receipt of this letter the plaintiffs sent the 38 warps in a wagon to the defendants' mills, in Paterson, New Jersey, and tendered them to the defendants' superintendent, who replied that his instructions from Mr. Hoffman were not to receive them. Twenty days afterwards, the president of the plaintiffs' company called upon the defendant Mr. Hoffman, and informed him that the plaintiffs had the balance of his order, 38 warps, and requested him to receive them, which he declined, saying that he had not ordered them. They were then worth about 63 cents a pound. The plaintiffs waited until the 19th of June, 1867, when they advised the defendants by letter that they had sent the 38 warps to an auctioneer in the city, to be sold at auction, informing the defendants of the place, and of the day and hour of the sale, and that they would hold them responsible for the difference between the contract price and the price they might bring. They were accordingly sold at action, at the time and place named, for 43 cents a pound, the sale having been duly advertised and a large number of persons being present. The contract price for the 38 sold was $1,064, and they brought at the auction sale $617.39, making a difference of $446.61, which amount the plaintiffs have recovered in this action.

The defendants' superintendent testified that the warps were such as the plaintiffs generally manufactured and had on hand. The spring of the year is the plaintiffs' busy season, and their superintendent testified that they did not, in the busy season, have these warps on hand. Mr. Ridgway, the president of the plaintiffs' company, testified that he did not know whether they had any warps on hand when the first letter was received from the defendants, nor could he tell how many they had on hand during the subsequent correspondence; that they were manufacturing similar warps for other persons

at the same time, that they were coming off continually, every half hour, as they were manufacturing this class of goods all the while; that he could not say that they were ready all the time to deliver the whole of them, that whenever a demand was made, they were ready to fill the order; but I do not understand by this remark, that they were ready to fill the order for the fifty warps when it was received, but that they were ready to supply the defendants as they wanted them, for the defendants' superintendent testified that the plaintiffs' superintendent came to the defendants' mill and said, "our folks and your folks have made an agreement about warps," and that he, the defendants' superintendent, was to receive the warps, as and when he wanted them, and he swore that he sent for six warps at a time; that he sent twice and received six warps each time; Mr. Hoffman, the defendant, having told him that he was to go to the plaintiffs' and get warps when he wanted them. Mr. Ridgway, the president, also testified that the cotton was not bought for the defendants nor the yarn in the spool made for them particularly; that the plaintiffs were in the habit of *manufacturing* this kind of warps; that they seldom kept them on hand, and had frequent orders for them; that they were not standard articles; that there was no market price for such warps at the time of the sale, and that they are an article not usually sold at auction, the witness never having seen any sold in that way except in this instance.

I think this must be regarded as an agreement between the plaintiffs and the defendants for the manufacture of the fifty warps, and that it was not a contract of sale within the meaning of the statute. It has several distinguishing features. In the first place, the article is one of a peculiar kind. In the next place, the number contracted for was to be produced and delivered as the defendants wanted them. In the third place, it is a fair presumption, from the evidence, that they were all manufactured after the order for them was accepted. Wilson, the defendants' superintendent, said they were such as the plaintiffs generally manufactured and had on hand. Ridgway, the president, could not say whether they had usually warps of this description on hand from the time that the contract was

made, and the residue of the warps were ready for delivery, but left it to be inferred the thing had not, by the statement that it was the spring of the year, which he declared was generally a busy time with the plaintiffs, and the testimony of the plaintiffs' superintendant is explicit upon this point, for he swears that the plaintiff did not, in the busy season, have these warps on hand. He was the one who would necessarily know, and his statement must be regarded as decisive, there being nothing to impeach it in the testimony of the plaintiffs, or in the loose, general statement of the defendants' superintendent. Fourthly, the evidence warrants the conclusion that the agreement contemplated that the warps were to be of the plaintiffs' manufacture. This, I think, is indicated sufficiently by a passage in the very letter in which the order is given by the defendants for the fifty warps and the promise held out of a further order for fifty more, which passage is in these words, at the end of the letter: "Finding your warps *uniform* we shall be *faithful to you*," which brings the case within the distinction relied upon in *Hight* v. *Ripley* (*supra*), that it is the labor and skill of the person to whom the order is given, combined with the material, that is contracted for, and to which the other party is entitled, and which distinguishes it from *Gardiner* v. *Joy* (*supra*), in which, to quote from the work of Mr. Browne, it was clearly no part of the bargain that the vendor should manufacture the candles. (Browne on the Statute of Frauds, § 308, 3 ed.); and lastly, between the time when the order was accepted, the 29th of March, 1867, and the 30th of April, 1867, when the defendants were advised by letter that the "balance of the order had been finished some time," there was a rapid depreciation in the value of the article, having fallen during the month of March and April from 85 to 65 cents a pound, and afterwards down to 60 cents, a point reached on the 21st of June, 1867, in view of which it might be that the plaintiff would not have made those fifty warps at that time but for the fact that they had an order from the defendants to manufacture that specific quantity, at a specific price.

Though I do not regard this as a contract of sale, and think that our decision should be put upon that ground as the proper

disposition of the case, still if it were necessary to hold it to be a contract of that description within the meaning of the statute, the judgment entered upon the report of the referee would still be correct.

It may be doubtful if there was sufficient proof of a memorandum in writing of the contract subscribed by the parties to be charged. (2 Rev. Stat. 140, § 3, subd. 1.) It is not necessary that it should be comprised in one paper. It may be embraced in several, but they must be connected with, and refer to, each other, and the mutual relation of the writings must appear upon the face and cannot be established by parol evidence, it being the policy of the statute to take the cases enumerated entirely out of the reach of verbal testimony. (*Wright* v. *Weeks*, 25 N.. Y. 153; *Stocker* v. *Partridge*, 2 Robt. 193; Greenleaf on Evidence, § 268; Browne on the Statute of Frauds, 346, 3 ed., and cases there cited.)

In the case before us, the defendants' letter was simply a proposal that the plaintiff should accept an order for fifty warps instead of one hundred, at the price of seventy cents. This was the exact language used, and, the existence of a contract or not, depended on the acceptance of the order upon the terms proposed. The acceptance was by letter, but the contents of this letter, as well as the fact that it was mailed to the defendants, was established by parol evidence. No exception was taken to the proof, and as the letter is presumed to have reached the defendants in due course of mail, and might have been produced by them before the referee, it may be that this was sufficient proof of an acceptance in writing. (*Watts* v. *Ainsworth*, 6 Law T. N. S. 252.) But if there be doubt on this point, there was sufficient evidence of a delivery and acceptance of a part of the warps, to take the case out of the operation of the statute.

The agreement was an entirety. It was for fifty warps at a fixed price. This appears by the letter in which the order was given, and by the plaintiffs' letter of acceptance, and when the latter letter, addressed to the defendants, in New York, was mailed to them by the plaintiffs, at Paterson, in New Jersey, the contract was complete. (*Vassar* v. *Camp*, 11 N. Y. 441, and the cases there cited.) The correspondence did not desig-

nate when the warps were to be delivered, but it appears by the testimony of Ridgway, King and Wilson, that they were to be delivered as the defendants' superintendant wanted them, and whether that were so or not, the delivery and acceptance of a portion of them was sufficient to take the case out of the statute. It is not essential under our statute that the delivery and acceptance of a part of the goods should take place at the time of the making of the contract, but the delivery and acceptance of a part afterwards will suffice. (*Sale* v. *Darragh*, 2 Hilt. 201, 202; *McKnight* v. *Dunlop*, 5 N. Y. 537; *Sprague* v. *Blake*, 20 Wend. 61.) Twelve of the warps were delivered to the defendants' superintendent, who swore that he was instructed by the defendants to go and get the warps when he wanted them. He sent twice to the plaintiffs, each time for six, and they were delivered to him, and, to put at rest all question of the delivery and acceptance of a portion of the quantity ordered, the defendants paid for these twelve warps, by their checks, on the 29th of April and on the 22d or 23d of May following. (*Outwater* v. *Dodge*, 6 Wend. 397.)

The remaining questions in the case may be summarily disposed of. The defendants having refused to accept and pay for the residue of the warps, the plaintiff had the right to sell them, and hold the defendants for the deficiency. (*Sands* v. *Taylor*, 5 Johns. 395.) They gave the defendants notice of the time and place of sale, although, strictly, even this was not necessary. (*Lewis* v. *Greider*, 49 Barb. 606.) The sale was by public auction, which, as a general rule, is the appropriate and proper way to ascertain the value of the thing at the time, and if, as appeared, there was no market price for warps at that time, and that they were an article not usually sold at auction, it does not lie with the defendants to complain, for having had ample notice of the sale, they might have attended it and protected themselves by buying the warps, if the price they brought was below their value. The report of the referee should be affirmed.

VAN BRUNT, J. I concur.

LOEW, J. I concur in the conclusion arrived at by the Chief Justice.

Judgment affirmed.